# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>M & G USA CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 17-12307 (BLS)<br><br>Jointly Administered |
| M&G Polimeros Brasil S.A.,<br><br>Plaintiff,<br><br>v.<br><br>M&G Polymers USA, LLC and Comerica Bank,<br><br>Defendants. | Adv. Proc. No. 18-50007-BLS<br><br>**Related to Docket No. 16** |

**Opening Brief in Support of Comerica Bank's
<u>Motion to Dismiss Amended Complaint</u>**

CONNOLLY GALLAGHER LLP
Karen C. Bifferato (DE Bar No. 3279)
Jeffrey C. Wisler (DE Bar No. 2795)
Kelly M. Conlan (DE Bar No. 4786)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 757-7300
Facsimile: (302) 757-7299
Email: kbifferato@connollygallagher.com
Email: jwisler@connollygallagher.com
Email: kconlan@connollygallagher.com

MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
Jonathan S. Green, Esq.
Steven A. Roach, Esq.
Erika L. Giroux
150 West Jefferson, Suite 2500
Detroit, MI 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
Email: greenj@millercanfield.com
Email: roach@millercanfield.com
Email: giroux@millercanfield.com

Dated: March 15, 2018

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M & G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.à r.l. (1270), M&G Chemicals S.A. (1022), M&G Capital S.à r.l. (7812), M & G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES………………………………………………………… ii

STAGE OF PROCEEDING…………………………………………………….. 1

SUMMARY OF ARGUMENT……………………………………………………1

FACTUAL BACKGROUND…………………………………………………….... 2

LEGAL STANDARD…………………………………………………….. 4

ARGUMENT…………………………………………………………………….5

    A. Brasil's Claim Is Controlled by State, Not Federal Law……………………… 5

    B. Polymers and Brasil Had a Contract, and Texas Law Governs the Contract….. 6

        1.   The Contract is for a Sale of Goods…………………………………..6

        2. The Contract is Not a Consignment…………………………………...7

        3. The Contract Does Not Evidence a "Sale or Return"……………………… 8

        4. The Parol Evidence Rule and Statute of Frauds Bar Evidence of Any "Administrative Arrangement."……………………………………………8

    C.   Brasil's Constructive Trust Claim Fails as a Matter of Law………………….. 10

CONCLUSION……………………………………………………………………. 15

# TABLE OF AUTHORITIES

**Page**

Cases

*Aquaplex, Inc. v. Rancho la Valencia, Inc.*,
　297 S.W.3d 768 (Tex. 2009) ...................................................................................... 10
*ARA Auto. Grp. v. Cent. Garage, Inc.*,
　124 F.3d 720 (5th Cir. 1997) ...................................................................................... 11
*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...................................................................................................... 4
*Associated Indem. Corp. v. CAT Contracting, Inc.*,
　964 S.W.2d 276 (Tex. 1998) ...................................................................................... 11
*Asurion Ins. Servs., Inc. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*,
　377 B.R. 478 (Bankr. D. Del. 2007) ..................................................................... passim
*Azzata v. Am. Bedding Indus., Inc.*,
　432 B.R. 115 (Bankr. D. Del. 2010) ............................................................................. 4
*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ...................................................................................................... 4
*Brannon v. Gulf States Energy Corp.*,
　562 S.W.2d 219 (Tex. 1977) ........................................................................................ 8
*Brookside Farms v. Mama Rizzo's, Inc.*,
　873 F. Supp. 1029 (S.D. Tex. 1995) ............................................................................ 9
*Burtch v. Milberg Factors, Inc.*,
　662 F.3d 212 (3d Cir. 2011) .......................................................................................... 4
*Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*,
　359 B.R. 566 (Bankr. D. Del. 2007) ............................................................................. 6
*Connelly v. Lane Constr. Corp.*,
　809 F.3d 780 (3d Cir. 2016) .......................................................................................... 4
*Endeavor Energy Res., L.P. v. Heritage Consol., LLC (In re Heritage,
　Consol., LLC)*, 765 F.3d 507 (5th Cir. 2014) ............................................................. 11
*Fluor Enters., Inc. v. Orion Ref. Corp. (In re Orion Ref. Corp.)*,
　341 B.R. 476 (Bankr. D. Del. 2006) ....................................................................... 6, 14
*Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*,
　12 F.3d 426 (5th Cir. 1994) .................................................................................. 10, 14
*In re Morgansen's Ltd.*,
　302 B.R. 784 (Bankr. E.D.N.Y. 2003) .......................................................................... 8
*Kedra v. Schroeter*,
　876 F.3d 424 (3d Cir. 2017) .......................................................................................... 4
*King v. Texacally Joint Venture*,
　690 S.W.3d 618 (Tex. App. 1985) ................................................................................ 9
*Monnig's Department Stores, Inc. v. Azad Oriental Rugs, Inc. (In re Monnig's Department
　Stores, Inc.)*,
　929 F.2d 197 (5th Cir. 1991) ......................................................................... 10, 12, 13

Cases

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings, LLC)*,
 420 B.R. 112 (Bankr. S.D.N.Y. 2009) ................................................................................ 11
*Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*,
 432 B.R. 135 (Bankr. D. Del. 2010) ..................................................................................... 6
*Official Committee of Unsecured Creditors v. Columbia Gas Systems (In re Columbia Gas Systems, Inc.)*,
 997 F.2d 1039 (3d Cir. 1993) ......................................................................................... 5, 12
*Pan Am. Bank v. Nowland*,
 650 S.W.3d 879 (Tex. App. 1983) ........................................................................................ 8
*Perez v. Alcoa Fujikura, Ltd.*,
 969 F. Supp. 991 (W.D. Tex. 1997) ..................................................................................... 8
*Rankin v. Naftalis*,
 557 S.W.2d 940 (Tex. 1977) .............................................................................................. 11
*Schmidt v. Skolas*,
 770 F.3d 241 (3d Cir. 2014) ................................................................................................. 5
*Tiare Int'l, Inc. v. United Fixtures Co. (In re Interlake Material Handling, Inc.)*,
 441 B.R. 437 (Bankr. D. Del. 2011) ..................................................................................... 6
*Walser v. Tex. Music Group, Inc. (In re Antone's Records, Inc.)*,
 445 B.R. 758 (Bankr. W.D. Tex. 2011) .............................................................................. 10
*Williams v. Countrywide Home Loans, Inc.*,
 504 F. Supp. 2d 176 (S.D. Tex. 2007) ............................................................................... 11

Rules

Fed. R. Civ. P. 9(b) ...................................................................................................................... 10
Federal Rule of Bankruptcy Procedure 7012 ................................................................................ 1
Federal Rule of Civil Procedure 12(b)(6) ................................................................................. 1, 4

Other Authorities

*The Rights of Art Consignor-Collectors When Their Art Dealer Files for Bankruptcy*,
 58 Duke L.J. 1864– (2009) ................................................................................................... 7
Uniform Commercial Code § 2-326 .............................................................................................. 8
Uniform Commercial Code: 2-105, 2-106, 2-326, 2-401(a), 9-102(20), 9-103(d), 9-322, and 9-324 ........................................................................................................................................ 1

## STAGE OF PROCEEDING

This is the first responsive pleading filed by Comerica concerning the Amended Complaint [Ad. Proc. D.I. 16]. Comerica previously filed a Motion to Dismiss Adversary Proceeding [Ad. Proc. D.I. 9] in response to Plaintiff's Complaint for Imposition of a Constructive Trust [Ad. Proc. D.I. 1].

## SUMMARY OF ARGUMENT

Plaintiff M&G Polimeros Brasil, S.A. ("Brasil") filed an Amended Complaint [Ad. Proc. D.I. 16] ("Amended Complaint") against Comerica Bank ("Comerica") and against M&G Polymers USA, LLC ("Polymers"), on March 1, 2018, seeking the imposition of a constructive trust upon certain polyethylene terephthalate ("PET") product sold to Polymers by Brasil, and upon the cash proceeds derived from Polymers' sale of this PET product. Comerica has a perfected, first-priority lien on all Inventory and Accounts, including proceeds thereof, of Polymers. Final Cash Collateral Order (ECF 487), pp. 6–7, 33–35. Brasil fails to state a claim in its Amended Complaint to support the existence of a constructive trust. A constructive trust is an extraordinary remedy, and the facts in the Amended Complaint, even assuming them to be true for purposes of this Motion, evidence merely an ordinary commercial relationship involving a debt between a supplier and a distributor. Comerica primarily relies upon this Court's opinion in *Asurion Ins. Servs., Inc. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478 (Bankr. D. Del. 2007), and the following provisions of the Uniform Commercial Code: 2-105, 2-106, 2-326, 2-401(a), 9-102(20), 9-103(d), 9-322, and 9-324, in addition to the other authority cited below.

**FACTUAL BACKGROUND**

Prior to the Debtors' Chapter 11 bankruptcy filings, Polymers purchased PET product from Brasil, an affiliate of the Debtors. As Brasil concedes, this trade relationship was "simple and straightforward": Brasil "sold" the PET to Polymers, and Polymers in turn sold the PET to its U.S. customers and recorded journal entries reflecting the accrued receivables owed to Brasil in the normal course. Am. Compl. ¶¶ 1, 22, 57, 81. In its original Complaint, Brasil conceded that "title for the PET product pass[ed]" from Brasil to Polymers.[1] *See* Ad. Proc. D.I. 1, ¶ 17. Brasil characterizes this relationship with Polymers as one of "administrative convenience," for which Polymers withheld a "small administrative fee," but admits, repeatedly, that "no contractual arrangement" documented this purported fee arrangement. Am. Compl. ¶¶ 22, 26, 30. What existed between Polymers and Brasil, then, was an ordinary commercial relationship between a trade creditor and a trade supplier. *See also* Cash Management Motion (ECF 7) at pp. 9–11 (describing Polymers' intercompany transactions with Brasil).

Brasil alleges a change in its relationship with Polymers took place in September 2017, at which point Brasil began invoicing Polymers[2] for the PET product. Am. Compl. ¶ 30. Polymers allegedly obtained "no actual ownership" of the PET but used the proceeds from the sales of the PET to satisfy the receivables to Brasil. Am. Compl. ¶¶ 3, 30. Brasil declares this arrangement to be a consignment. Am. Comp. ¶ 36. Yet Brasil, as a matter of public record, never filed a UCC-1 financing statement to evidence an interest in the PET product, let alone a purchase-money security interest, nor did it provide notice to Comerica of any such interest. Indeed, Brasil concedes

---

[1] Brasil has, without explanation, eliminated this admission from its Amended Complaint.

[2] The invoices issued by Brasil documenting these transactions, attached as Exhibit A, predate this alleged September timeline. In fact, even the invoice that Brasil includes in its Amended Complaint is dated August 21, 2017. Am. Compl. ¶ 35.

repeatedly that there is no contract, written or otherwise, to support its claim. Am. Comp. ¶¶ 21, n. 3, 26 ("never been a contractual agreement"), 30 ("did not enter into a contract"), 31 ("no contractual arrangement"), 34 ("Polimeros did not enter into a contract"), 36 ("no contractual relationship"), 54 ("no contractual arrangement"), 66 ("no contractual arrangement"), and 78 ("no contractual arrangement"). Brasil, therefore, has no legitimate claim to the PET or its proceeds. Comerica, on the other hand, filed its financing statement, and thereby perfected its security interest in the PET proceeds, as far back as September 30, 2013. Comerica is entitled to and rightfully should benefit from its diligence as a perfected first-priority secured creditor.

The terms of the relationship between Brasil and Polymers are clear from the purchase orders and invoices between the two companies attached as Exhibit A.[3] The purchase orders and invoices constitute contracts. Texas law governs the contracts. The invoices require Polymers to pay the purchase price within 60 days of the date on the bill of lading. Not a single invoice or purchase order mentions, *inter alia*, the intention to create or existence of a trust, the calculation or payment of an administrative fee, or the price at which Polymers must sell the PET to its customers. Indeed, the facts that the invoices contain both a set amount that Polymers is to pay Brasil and a set time for payment directly contradict Brasil's claim that Polymers was a mere conduit for which service Polymers was to receive an administrative fee. Not one of these documents even hints at an obligation on the part of Polymers to segregate the proceeds of the PET sales or to provide an accounting to Brasil. Likewise, none of these writings includes the term "or

---

[3] Comerica obtained the attached invoices, purchase orders, and bills of lading from the Debtors several weeks *after* Polymers filed for bankruptcy, and only *after* Brasil put Comerica on notice that it intended to challenge Comerica's collateral position. These documents were issued by and to Brasil, an affiliate of the Debtors. Brasil never claims (likely because it could not reasonably do so) that it does not possess or could not access copies of these documents, nor does Brasil claim that these documents are inaccurate. Rather, Brasil has simply chosen to rely on the bare allegations in its Amended Complaint, to which it attached no evidence in support of its claims.

return," as required by Texas Business & Commercial Code § 2.326(c). Rather, each invoice requires payment within 60 days of the bill of lading date, without regard as to whether Polymers has sold the PET.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a plaintiff must have pled "sufficient factual allegations . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility where it contains enough factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the alleged misconduct" and requires "more than a sheer possibility that the defendant acted unlawfully." *Iqbal*, 556 U.S. at 678. While the court accepts all well-pleaded allegations as true and construes them in the light most favorable to the plaintiff, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), Rule 8's pleading standard demands more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678.

In evaluating a complaint under Rule 12(b)(6), the court must first "take note of the elements a plaintiff must plead to state a claim." *Burtch*, 662 F.3d at 221 (internal quotation marks omitted). The court should then "separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions," which are not "entitled to the assumption of truth." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *Azzata v. Am. Bedding Indus., Inc.*, 432 B.R. 115, 119 (Bankr. D. Del. 2010). Finally, the court should determine whether the remaining factual allegations have "nudged the claim across the line from conceivable to plausible." *Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 679-80). Although courts generally consider only the allegations in the complaint and attached

return," as required by Texas Business & Commercial Code § 2.326(c). Rather, each invoice requires payment within 60 days of the bill of lading date, without regard as to whether Polymers has sold the PET.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a plaintiff must have pled "sufficient factual allegations . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility where it contains enough factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the alleged misconduct" and requires "more than a sheer possibility that the defendant acted unlawfully." *Iqbal*, 556 U.S. at 678. While the court accepts all well-pleaded allegations as true and construes them in the light most favorable to the plaintiff, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), Rule 8's pleading standard demands more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678.

In evaluating a complaint under Rule 12(b)(6), the court must first "take note of the elements a plaintiff must plead to state a claim." *Burtch*, 662 F.3d at 221 (internal quotation marks omitted). The court should then "separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions," which are not "entitled to the assumption of truth." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *Azzata v. Am. Bedding Indus., Inc.*, 432 B.R. 115, 119 (Bankr. D. Del. 2010). Finally, the court should determine whether the remaining factual allegations have "nudged the claim across the line from conceivable to plausible." *Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 679-80). Although courts generally consider only the allegations in the complaint and attached

exhibits, the court may also consider "document[s] *integral to or explicitly relied* upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks omitted) (emphasis in original). Brasil expressly acknowledges, cites to, and relies upon the purchase orders, invoices, and bills of lading between itself and Polymers in its Amended Complaint. *See* Am. Compl. ¶¶34–43. Brasil in fact admits that it filed the Amended Complaint specifically "to address th[is] documentary material." Am. Compl. ¶ 13. Therefore, this Court may likewise consider the purchase orders, invoices, and bills of lading issued between Polymers and Brasil that are attached as Exhibit A.

## ARGUMENT

### A. Brasil's Claim Is Controlled by State, Not Federal Law.

This Court has previously determined the appropriate analysis for a constructive trust claim. *See Asurion Ins. Servs., Inc. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478 (Bankr. D. Del. 2007). The Court will look to the factors enumerated in *Official Committee of Unsecured Creditors v. Columbia Gas Systems (In re Columbia Gas Systems, Inc.)*, 997 F.2d 1039 (3d Cir. 1993), the seminal case in the Third Circuit governing constructive trust claims in bankruptcy, to determine whether a constructive trust is appropriate. Where federal regulation pervasively governs the relationship between the pre-bankruptcy debtor and the claimant, the court should apply federal common law to vindicate the federal interest and to avoid creating inconsistent interpretations of the same federal statutory scheme. *Id.* at 1055-58 (noting that "[c]reditors cannot reasonably assume that state law will allocate various parties' interest in federally created property rights"). By contrast, where the creditor's claim does not arise out of a federal statute, the court will apply state law to evaluate whether the creditor has established the requisite elements for imposition of a constructive trust. *See Amp'd Mobile*, 377 B.R. at 483;

*Fluor Enters., Inc. v. Orion Ref. Corp. (In re Orion Ref. Corp.)*, 341 B.R. 476, 483 (Bankr. D. Del. 2006).

Here, Brasil has not invoked—indeed, has not even cited to—any federal law or statute in support of its claim. That is because Brasil and Polymers had an ordinary contractual relationship for the sale of goods, subject to and governed by state implementations of the Uniform Commercial Code. Therefore, this court should look to the relevant state law to assess Brasil's claim.

B. **Polymers and Brasil Had a Contract, and Texas Law Governs the Contract.**

The purchase orders and invoices (Exhibit A) between Brasil and Polymers make up the written contract ("Contract"), by which Brasil agreed to supply PET product to Polymers in exchange for payment. *See* Tex. Bus. & Commercial Code §§ 2.204, 2.206 cmt. 2. This Contract forms the basis for Brasil's Amended Complaint, and Brasil expressly acknowledges the Contract in the Amended Complaint. The Contract explicitly states that it is governed by Texas law; therefore, Texas law also controls Brasil's constructive trust claim. *See also Tiare Int'l, Inc. v. United Fixtures Co. (In re Interlake Material Handling, Inc.)*, 441 B.R. 437, 441 (Bankr. D. Del. 2011); *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 432 B.R. 135, 147 (Bankr. D. Del. 2010); *Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC),* 359 B.R. 566, 571 (Bankr. D. Del. 2007).

1. **The Contract is for a Sale of Goods.**

The Contract between Polymers and Brasil clearly contemplates a sale of goods. *See* Tex. Bus. & Commercial Code Ann. § 2.105(a) (defining "goods" as "all things . . . movable at the time of identification to the contract for sale"); § 2.106(a) (defining "sale" as "the passing of title from the seller to the buyer for a price"). Under this arrangement, Polymers issued purchase orders to Brasil, Brasil issued invoices to Polymers, and Brasil shipped the PET product to Polymers

accompanied by bills of lading. The invoices issued by Brasil as part of the Contract expressly provide for payment of the PET product within 60 days of the date on the corresponding bill of lading—further evidence that the arrangement between Brasil and Polymers constituted a sale of goods.

2. **The Contract is Not a Consignment.**

Brasil wrongly reads significance into the use of the term "consignee" in the invoices and bills of lading. As used in regard to shipment of goods, "'[c]onsignee' means a person named in a bill of lading to which or to whose order the bill promises delivery." Tex. Bus. & Commercial Code § 7-102(a)(3). Here, the Contract documents all evidence a sale of goods. Indeed, the very invoice contained in paragraph 35 of the Amended Complaint provides for payment within 60 days of the bill of lading date. *Compare* Section B.1, *supra*, *with* Note, Hilary Jay, *A Picture Imperfect: The Rights of Art Consignor-Collectors When Their Art Dealer Files for Bankruptcy*, 58 Duke L.J. 1864–65 (2009). ("A consignment sale occurs when a 'merchant takes possession of goods and holds them for sale with the obligation to pay the owner for the goods from the proceeds . . . . If the merchant does not sell the goods the merchant may return the goods to the owner without obligation.'"). Indeed, Brasil never actually alleges that it sold goods to Polymers on a consignment basis.[4]

3. **The Contract Does Not Evidence a "Sale or Return."**

Brasil also appears to hint that it believes the arrangement between itself and Polymers constitutes a "sale or return." However, the notion that a seller could demand the return of its goods at will is "so definitely at odds with any ordinary contract for sale of goods that if a written

---

[4] Although absent in the Amended Complaint, Brasil admitted in its original complaint that "receivables for the PET product immediately accrue at Polimeros when M&G Polymers receives the PET product." Complaint, ¶ 17.

agreement is involved the 'or return' term *must* be contained in a *written* memorandum." Uniform Commercial Code § 2-326, cmt. 3 (emphases added). The "or return" condition is therefore subject to and, in this case, barred by the parol evidence rule and statute of frauds. Tex. Bus. & Commercial Code § 2.326(c). Not a single purchase order or invoice issued between Polymers and Brasil contains the term "or return"; rather, the Contract includes a definite payment term wholly inconsistent with the notion of a "sale or return." Moreover, even if the transaction were construed to constitute a "sale or return," the PET product would still be considered property of the bankruptcy estate and subject to the claims of Polymers' creditors, including Comerica. *In re Morgansen's Ltd.*, 302 B.R. 784, 789 (Bankr. E.D.N.Y. 2003).

  **4. The Parol Evidence Rule and Statute of Frauds Bar Evidence of Any "Administrative Arrangement."**

As previously described, the purchase orders and invoices issued between Brasil and Polymers constitute the Contract. Evidence of any collateral agreement entered into for "administrative convenience" is barred by both the parol evidence rule and statute of frauds. The parol evidence rule "is a rule of substantive law which provides that extrinsic evidence is not admissible to vary, add to, or contradict the terns of a written instrument that is facially complete and unambiguous." *Perez v. Alcoa Fujikura, Ltd.*, 969 F. Supp. 991, 1006 (W.D. Tex. 1997) (citing *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219, 222 (Tex. 1977)). It "denies efficacy to prior or contemporaneous expression relating to the same subject matter as that encompassed in the final written agreement." *Perez*, 969 F. Supp. at 1006 (citing *Pan Am. Bank v. Nowland*, 650 S.W.3d 879, 884 (Tex. App. 1983)). Relatedly, contracts for the sale of goods exceeding $500—as is the Contract in this case—must be in writing, and "oral agreements that materially modify a written agreement within the Statute of Frauds are not enforceable." *Brookside Farms v. Mama Rizzo's, Inc.*, 873 F. Supp. 1029, 1033 (S.D. Tex. 1995) (citing *King v.*

*Texacally Joint Venture*, 690 S.W.3d 618, 619 (Tex. App. 1985)). *See also* Tex. Bus. & Commercial Code § 2.201(a) (statute of frauds), § 2.202 (parol evidence rule), § 2.209(c) (on modification).

The "administrative arrangement" described by Brasil materially varies from the terms of the written Contract. Neither the invoices nor purchase orders make any mention of a "small administrative fee" or how that figure would be deducted from the clearly stated net/60 payment terms, nor do they provide any indication that Brasil "retains full title of the PET." Am. Compl. ¶¶ 22–23.[5] On their face, the invoices and purchase orders constitute a complete and integrated contract evidencing a sale of goods from Brasil to Polymers, and evidence of any prior or contemporaneous agreements at variance with the terms of this Contract is not only irrelevant but also barred by substantive rules of law.

Likewise, even if this evidence were not barred by both the parol evidence rule and statute of frauds, pursuant to Texas Business & Commercial Code Ann. § 2-401(a), "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." As noted above, Brasil failed to file a UCC-1 and therefore is an unsecured creditor. Moreover, even assuming that this arrangement did constitute a consignment (which Brasil never directly alleges), Brasil would have been required to both file a financing statement *and* also provide notice to Comerica of its interest in order to perfect a purchase-money security interest in the PET collateral. Tex. Bus. & Commercial Code §§ 9.103(d), 9.324(b). Brasil did neither and, therefore, retained no interest in the PET product.

**C.      Brasil's Constructive Trust Claim Fails as a Matter of Law.**

A constructive trust is an equitable remedy that courts impose sparingly. *See Walser v. Tex.*

---

[5] Brasil makes no allegation as to how the alleged administrative fee is to be calculated.

*Music Group, Inc. (In re Antone's Records, Inc.)*, 445 B.R. 758, 784 (Bankr. W.D. Tex. 2011) (stating that a constructive trust is to be imposed only to "prevent unjust enrichment resulting from an unconscionable act") (internal quotation marks omitted). This remedy requires some "wrongdoing greater than the nonpayment of a monetary debt." *Monnig's Department Stores, Inc. v. Azad Oriental Rugs, Inc. (In re Monnig's Department Stores, Inc.)*, 929 F.2d 197 (5th Cir. 1991). Under Texas law, the elements of a constructive trust are (1) actual fraud or a relationship of trust and confidence giving rise to a fiduciary duty; (2) unjust enrichment; and (3) tracing of the trust res. *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 437 (5th Cir. 1994).

Brasil has failed to allege actual fraud. To establish fraud, Texas law requires the plaintiff to offer evidence that the defendant made a (1) materially (2) false representation, (3) knowing that it was false, (4) with the intent that the other party rely on it, (5) and the other party so relied (6) and suffered harm thereby. *Aquaplex, Inc. v. Rancho la Valencia, Inc.* 297 S.W.3d 768, 774 (Tex. 2009). Brasil has entirely failed to identify any materially false representation made to it by Polymers. *See also* Fed. R. Civ. P. 9(b) (requiring a plaintiff to "state with particularity the circumstances constituting fraud").

Brasil has similarly failed to establish the existence of a fiduciary relationship between itself and Polymers. In the business context, a fiduciary duty requires that "the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 2d 176, 192 (S.D. Tex. 2007) (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). Thus, an ordinary business relationship, even where the parties have been engaged in a joint venture or partnership, is insufficient except in unusual circumstances. *Endeavor Energy Res., L.P. v. Heritage Consol., LLC (In re Heritage Consol., LLC)*, 765 F.3d 507, 517 (5th Cir. 2014)

(citing *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977)). Brasil has identified no facts distinguishing its relationship with Polymers or its directors from the relationship of trust that ordinarily exists between commercial counterparties. *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings, LLC)*, 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009) (holding that, under Delaware law, a parent corporation owes no fiduciary duty to its subsidiaries). The fact that one business "trusts another, and relies upon [its] promise to perform a contract, does not rise to a confidential relationship[,] [as] [e]very contract includes an element of trust and confidence that each party will faithfully perform." *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 725 (5th Cir. 1997) (citation omitted). Polymers and Brasil chose to enter into their arrangement, as Brasil states, for "administrative convenience," and Polymers agreed to "apportion payments collected for its sales of [Brasil's[] product . . . in the form of intercompany receivables. Am. Compl. ¶¶ 5, 54, 78. Nothing distinguishes that arrangement from an ordinary supplier-distributor relationship.

Far from unjustly enriching Comerica, enforcing Comerica's security interest in this situation simply respects the reasonable commercial investment-backed expectations the Uniform Commercial Code intends to cultivate. By contrast, if a constructive trust were imposed, *Brasil* would be the unjustly enriched party: while Comerica perfected its security interest and subsequently loaned tens of millions of dollars to Polymers in reliance on the priority of that interest, Brasil made no effort to record or notice any interest it may have had in the PET collateral, let alone to document its purported arrangements with Polymers. Imposing a constructive trust would reward Brasil's negligence and simultaneously penalize Comerica's diligence.

Finally, Brasil has the burden to identify and trace the property it alleges is held in trust. *Official Comm. of Unsecured Creditors v. Columbia Gas Sys. (In re Columbia Gas Sys., Inc.)*, 997

F.2d 1039, 1063 (3d Cir. 1993). Brasil failed to carry its burden. As in *Amp'd Mobile*, it is "abundantly clear" that Polymers was not required to "segregate, or otherwise separately treat or account for" the PET purchased from Brasil, nor was Polymers under any obligation to "maintain separate accounts to hold" the proceeds. *See* 377 B.R. at 489. When funds are commingled, the portion left to the beneficiary is presumed to represent "trust funds that have *never been dissipated*." *Id.* at 489-90 (citing *Columbia Gas*, 997 F.2d at 1063) (emphasis added). However, in this case, the Final Cash Collateral Order (ECF 487) explicitly provides that any funds expended by Polymers from its cash collateral accounts "shall be treated as having first come from the[u]nencumbered [f]unds and not the funds subject to a properly perfected, non-avoidable, first-priority, security interest or other lien in favor of Comerica." ¶ 19(c). Thus, any funds to which Brasil claims it is entitled have already been spent.

This case is much like *Monnig's, supra*, where a rug company entered into a licensing agreement by which it rented space in a department store in exchange for a commission on the rug sales. 929 F.2d at 199. The department store collected all proceeds from the sale of the rugs in the normal course and was then obligated to remit the proceeds back to the rug company, net of its commission. *Id.* The agreement did not restrict the department store's use of the proceeds from the rug sales "in any way," nor did it require the store to "deposit or disburse the funds in any particular fashion" or to segregate the rug sale proceeds. *Id.* at 199–200. Similarly, in this case, Polymers collected the proceeds from its PET sales from all of its customers and was then, at least according to the Complaint, supposed to remit to Brasil the payments due Brasil in payment of the intercompany receivable, while withholding a "small administrative fee" (i.e., a commission). In the meantime, however, Polymers was under no obligation to segregate the proceeds or to use them in any particular manner. Just like the rug company in *Monnig's*, Brasil is not entitled to the

imposition of a constructive trust and is merely an unsecured trade creditor.

Likewise, this case bears a strong resemblance to *Amp'd Mobile*, in which an insurance company entered into an arrangement with a telephone service provider (the debtor) to provide certain wireless loss, theft, and damage protection to the service provider's customers. 377 B.R. at 481. The service provider was to bill and collect the monthly insurance premiums from its customers in the normal billing cycle and then remit the premiums to the insurer. *Id.* This Court declined to impose a constructive trust over the premiums, finding that the parties lacked "[s]ubstantial indicia supporting an inference of a fiduciary or trust relationship—such as clear and explicit language in the governing documents, affirmative statements in the governing documents that the Debtor would have no interest in the Premiums, segregation of Premiums, [or] a chronology of payments requiring the Debtor to remit only those Premiums actually received from its customers." *Id.* at 485. The relationship between Brasil and Polymers lacks precisely the same indicia. Brasil has not—and cannot—identify any evidence that it retained title to the PET product or that Polymers bore any special obligation with regard to the PET: in sum, Brasil cannot demonstrate that its relationship was anything other than an ordinary commercial relationship for the sale of goods.

Furthermore, imposing a constructive trust in these circumstances would gravely undermine the important federal policy of equal treatment of classes of creditors in bankruptcy. *Cf. Orion Ref. Corp.*, 341 B.R. at 483. Brasil's argument here is effectively that it can simply circumvent the Bankruptcy Code's priority rules by creatively re-characterizing an ordinary commercial relationship. Global companies routinely transact business in the United States through the use of domestic subsidiaries like Polymers. Imposing a constructive trust when one of these subsidiaries fails to pay its intercompany trade partner would mock the Bankruptcy Code's

priority scheme. *Haber Oil*, 12 F.3d at 436 ("Because the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason for doing so.")

Brasil states that Polymers "had no right to retain [the product] (for its own use or for the benefit of its creditors) without compensating" Brasil. Am. Compl. ¶ 47. What Brasil has described is an ordinary commercial debt obligation: a company has an obligation to pay its trade creditors. Unfortunately, Polymers did not, and Brasil is not the only trade creditor that was not paid. Brasil acknowledges that it is addressing the approximately $90 million intercompany receivable owed "through claims in [Polymers's] Bankruptcy case." Am. Compl. ¶ 27, n.4. That is the proper, and only, remedy available for Brasil's claim here.

## CONCLUSION

For the foregoing reasons, Comerica respectfully requests that the Court dismiss Brasil's Amended Complaint.

Dated: March 15, 2018

CONNOLLY GALLAGHER LLP

*/s/ Karen C. Bifferato*
Karen C. Bifferato (DE Bar No. 3279)
Jeffrey C. Wisler (DE Bar No. 2795)
Kelly M. Conlan (DE Bar No. 4786)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 757-7300
Facsimile: (302) 757-7299
Email: kbifferato@connollygallagher.com
Email: jwisler@connollygallagher.com
Email: kconlan@connollygallagher.com

and

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jonathan S. Green, Esq.
Steven A. Roach, Esq.
Erika L. Giroux
150 West Jefferson, Suite 2500
Detroit, MI 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
Email: greenj@millercanfield.com
Email: roach@millercanfield.com
Email: giroux@millercanfield.com

*Counsel to Comerica Bank*