## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| M&G USA CORPORATION, *et al.*, | ) | Case No. 17-12307 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| M&G Polimeros Brasil S.A., | ) | |
| | ) | |
| Plaintiff. | ) | Adversary Case No:  18-50007 (BLS) |
| v. | ) | |
| | ) | |
| M&G Polymers USA, LLC and COMERICA BANK, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## POLIMEROS' BRIEF IN OPPOSITION TO DEFENDANT COMERICA'S MOTION TO DISMISS

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND..............................................................................................3

MOTION TO DISMISS STANDARD................................................................................6

ARGUMENT ....................................................................................................................7

I.     POLIMEROS HAS ADEQUATELY ALLEGED A CLAIM FOR UNJUST
       ENRICHMENT AGAINST DEFENDANTS.........................................................7

       A.     There Was No Contract Between Polimeros and M&G Polymers ........................8

       B.     The Parol Evidence Rule Does Not Bar Polimeros' Claim..................................11

II.    POLIMEROS IS ENTITLED TO A CONSTRUCTIVE TRUST ............................12

       A.     Delaware Law Governs Polimeros' Claim for a Constructive Trust....................13

       B.     Delaware Courts Regularly Impose Constructive Trusts .....................................14

       C.     Even if the Court Applies Texas Law, Polimeros Has Still Adequately
              Alleged a Constructive Trust...............................................................................16

       D.     Polimeros Has Adequately Alleged Tracing At This Stage .................................19

III.   POLIMEROS HAS ADEQUATELY ALLEGED SUPERIOR TITLE AS A
       CONSIGNOR ....................................................................................................21

CONCLUSION ...............................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alltrista Plastics, LLC v. Rockline Indus., Inc.*,
    2013 WL 5210255 (Del. Super. Ct. Sept. 4, 2013) ................................................................7

*In re Amp'd Mobile, Inc.*,
    377 B.R. 478 (Bankr. D. Del. 2007)..................................................................... 10, 11, 20

*ARA Auto. Grp. v. Cent. Garage, Inc.*,
    124 F.3d 720 (5th Cir. 1997) ............................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................................7

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
    804 F.3d 633 (3d Cir. 2015) ...............................................................................................6

*B.A.S.S. Grp., LLC v. Coastal Supply Co.*,
    2009 WL 1743730 (Del. Ch. June 19, 2009).....................................................................14

*In re Bake-Line Grp., LLC*,
    359 B.R. 566 (Bankr. D. Del. 2007)..............................................................................8, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................................7

*Belmont Int'l, Inc. v. Am. Int'l Shoe Co.*,
    313 Or. 112 (1992) ...........................................................................................................25

*In re BH S & B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) ..............................................................................19

*Boulden v. Albiorix, Inc.*,
    2013 WL 396254 (Del. Ch. Jan. 31, 2013)........................................................................14

*Brookside Farms v. Mama Rizzo's, Inc.*,
    873 F. Supp. 1029 (S.D. Tex. 1995)..................................................................................11

*In re Catholic Diocese of Wilmington, Inc.*,
    432 B.R. 135 (Bankr. D. Del. 2010)..................................................................................13

*Chaplake Holdings, LTD. v. Chrysler Corp.*,
    766 A.2d 1 (Del. 2001).....................................................................................................13

*In re Columbia Gas Sys. Inc.*,
    997 F.2d 1039 (3d Cir. 1993) ...............................................................................20

*Dryden v. Estate of Gallucio*,
    2007 WL 185467 (Del. Ch. Jan. 11, 2007)...........................................................12

*In re Edison Bros., Inc.*,
    243 B.R. 231 (Bankr. D. Del. 2000) .....................................................................20

*Eurpac Serv. Inc. v. Republic Acceptance Corp.*,
    37 P.3d 447 (Colo. App. 2000)..............................................................................25

*Fariba v. Dealer Servs. Corp.*,
    178 Cal. App. 4th 156 (2009) ................................................................................25

*In re Ferandos*,
    402 F.3d 147 (3d Cir. 2005) .............................................................................21-22

*In re First Cent. Fin. Corp.*,
    377 F.3d 209 (2d Cir. 2004) ....................................................................................2

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ...........................................................................6, 23

*GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.*,
    474 F. Supp. 1357 (W.D. Pa. 1979) .........................................................25, 26, 27

*Ginther v. Taub*,
    675 S.W.2d 724 (Tex. 1984) .................................................................................17

*Halpert v. Zhang*,
    966 F. Supp. 2d 406 (D. Del. 2013) ......................................................................10

*In re Heritage Consol., L.L.C.*,
    765 F.3d 507 (5th Cir. 2014) ................................................................................19

*Hogg v. Walker*
    622 A.2d 648 (Del. 1993 ...............................................................................15, 16

*Hydrocarbon Horizons, Inc. v. Pecos Dev. Corp.*,
    797 S.W.2d 265 (Tex. App. 1990) .........................................................................12

*In re Interlake Material Handling, Inc.*,
    441 B.R. 437 (Bankr. D. Del. 2011).......................................................................14

*Jackson Nat. Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999) ...............................................................................14

PHIL1 6939220v.1

*L&L Broad. LLC v. Triad Broad. Co., LLC,*
2014 WL 1724769 (Del. Super. Ct. Apr. 8, 2014) ...................................................8

*Lee v. Hasson,*
286 S.W.3d 1 (Tex. App. 2007) .............................................................................18

*In re Magna Entm't Corp.,*
438 B.R. 380 (Bankr. D. Del. 2010) ......................................................................20

*In re Marriage of Braddock,*
64 S.W.3d 581 (Tex. App. 2001) ...........................................................................17

*Martinez v. Martinez,*
2017 WL 3686850 (Tex. App. Aug. 23, 2017) ..................................................16-17

*Meadows v. Bierschwale,*
516 S.W.2d 125 (Tex. 1974) .................................................................................16

*MLMC, Ltd. v. Airtouch Commc'ns, Inc.,*
215 F. Supp. 2d 464 (D. Del. 2002) ......................................................................10

*Matter of Monnig's Dep't Stores, Inc.,*
929 F.2d 197 (5th Cir. 1991) ................................................................................20

*Nash v. Schock,*
1998 WL 474161 (Del. Ch. July 23, 1998) .........................................................8, 14

*Nationwide Mut. Fire Ins. Co. v. Sears, Roebuck & Co.,*
2008 WL 613145 (D. Del. Mar. 5, 2008) ...............................................................10

*Naughty Monkey LLC v. Marinemax Ne. LLC,*
2010 WL 5545409 (Del. Ch. Dec. 23, 2010) .........................................................13

*Nwokedi v. Unlimited Restoration Specialists, Inc.,*
428 S.W.3d 191 (Tex. App. 2014) .........................................................................21

*Perez v. Alcoa Fujikura, Ltd.,*
969 F. Supp. 991 (W.D. Tex. 1997) ...................................................................11-12

*Procom Energy, L.L.A. v. Roach,*
16 S.W.3d 377 (Tex. App. 2000) ....................................................... 12, 17, 18, 19

*Ricoh Co. v. Oki Data Corp.,*
2010 WL 3908603 (D. Del. Sept. 30, 2010) ...........................................................10

*Southwest Livestock & Trucking Co. v. Dooley,*
884 S.W.2d 805 (Tex. App. 1994) .........................................................................20

PHIL1 6939220v.1

*State v. All Approved Auto Sales, L.L.C.*,
  2009 WL 10674949 (Del. Com. Pl. Mar. 27, 2009).............................................22

*In re Suniva, Inc.*,
  2018 WL 1384353 (Bankr. D. Del. Mar. 16, 2018) ...........................................20

*Teachers' Ret. Sys. of Louisiana v. Aidinoff*,
  900 A.2d 654 (Del. Ch. 2006) ..............................................................*passim*

*Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*,
  1993 WL 344770 (Del. Ch. Aug. 27, 1993) .....................................................10

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007) .................................................................13

*Tri-State Chemicals, Inc. v. First State Bank, Stratford*,
  185 S.W.3d 519 (Tex. App. 2005) ...........................................................24

*In re TSAWD Holdings, Inc.*,
  565 B.R. 292 (Bankr. D. Del. 2017).....................................................23, 24

*Victaulic Co. v. Tieman*,
  499 F.3d 227 (3d Cir. 2007) ..................................................................7

*Wells Fargo Bank, N.A. v. Richardson*,
  2013 WL 4257967 (Del. Ch. Aug. 13, 2013) ....................................................14

*Wilkerson v. New Media Tech. Charter Sch. Inc.*,
  522 F.3d 315 (3d Cir. 2008) ..................................................................7

*Williams v. Countrywide Home Loans, Inc.*,
  504 F. Supp. 2d 176 (S.D. Tex. 2007)........................................................18

*In re WL Homes LLC*,
  476 B.R. 830 (D. Del. 2012)...............................................................22

**Statutes**

U.C.C. § 2.204 ..............................................................................11

U.C.C. § 2.206 ..............................................................................11

U.C.C.§ 6-9-101 *et. seq.* ..................................................................23

U.C.C. § 9-102(a)(20) ....................................................................23, 24

U.C.C. § 9-319(a) ..........................................................................24

iv

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 6, 7

PHIL1 6939220v.1

<u>**PRELIMINARY STATEMENT**</u>

This Adversary Proceeding seeks the return of at least $10 million in traceable proceeds currently held in an identifiable bank account by Defendant Comerica Bank ("Comerica"). These funds properly belong to Plaintiff M&G Polimeros Brasil S.A. ("Polimeros"). As clearly alleged in the Amended Complaint, the funds are the proceeds from the sale of polyethylene terephthalate ("PET") product that was manufactured by Polimeros and, at all relevant times, belonged to Polimeros. Defendant M&G Polymers USA, LLC ("M&G Polymers") only obtained this property from Polimeros in its capacity as a middleman or conduit for sales to Polimeros' customers. This administrative relationship existed for years. And for years Polimeros was denied tens of millions of dollars of receivables due to improper conduct and mismanagement by M&G Polymers. Polimeros sent its PET product to U.S. customers through M&G Polymers, but M&G Polymers -- controlled by the Debtors' legacy directors and management -- merely pocketed these customers' payments rather than sending the proceeds back to Polimeros.

In the fall of 2017, prior to commencement of these Chapter 11 cases, the Debtors' Chief Restructuring Officer ("CRO") recognized this ongoing injustice and sought to ensure that Polimeros finally received the benefit of its manufacture and sale of its own PET product. As alleged in the Amended Complaint, the CRO expressly acknowledged the ongoing "administrative" relationship between Polimeros and M&G Polymers and assured Polimeros that M&G Polymers would no longer abuse its position as conduit to retain proceeds that were *never* M&G Polymers' property and that were indisputably due to Polimeros. Yet before Polimeros could realize the full benefit of the CRO's intervention, this Chapter 11 proceeding commenced.

Over $10 million in traceable proceeds generated by sales of Polimeros' PET product remained in M&G Polymers' possession at the time of the Chapter 11 filings. But now -- absent

1

intervention by this Court -- Polimeros will be unjustly deprived of even this remaining and

discrete set of proceeds.  Worse yet, the entirety of these proceeds will go to Comerica, an entity

with absolutely no rights with respect to Polimeros, no involvement in the manufacture or sale of

Polimeros' PET product, and no basis for its attempt to capture these proceeds other than its

claim to a lien on *M&G Polymers*' (but not Polimeros') inventory.  If Comerica is successful,

Polimeros will have been unjustly deprived of its property not once but twice in this matter:  first

by M&G Polymers in abusing its role as conduit to pocket Polimeros' money, and now by

Comerica in thwarting the CRO's effort to right this wrong in order to merely appropriate the

remaining proceeds owed to Polimeros.  These facts -- alleged in detail in the Amended

Complaint -- plainly meet the elements of a claim for unjust enrichment and support imposition

of a constructive trust over the receivables at issue.[1]

Comerica's motion to dismiss does not -- and cannot -- attack these allegations head-on.

Rather, in its zeal to simply take property to which it is not entitled, Comerica invents a

"contractual" relationship between M&G Polymers and Polimeros and purports to support this

"contract" by cobbling together a number of separate extrinsic documents (invoices and a one

page "Conditions of Sale") which it submits with its motion to dismiss.  Not only is this tactic

disingenuous -- there is no basis for Comerica's claim that Exhibit A is comprised of related

---

[1]     Some Bankruptcy courts have expressed reluctance to impose constructive trusts because, "a constructive trust
        claim is intended to prevent one who failed to meet an obligation or committed fraud or other misconduct from
        becoming unjustly enriched" and, in the typical bankruptcy matter, the trustee (or debtor in possession) has the
        property at issue but has done nothing wrong.  *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 218 (2d Cir.
        2004).  But this logic simply does not apply here, where the property at issue was ***never*** part of the estate.
        Moreover, the only two parties with any claimed interest in the property are Polimeros and Comerica.  The
        choice before the Court is thus whether the receivables should go to Polimeros -- the party that manufactured
        the PET product from which the receivables were generated, owned this property at all times, and delivered it to
        M&G Polymers (in its capacity as conduit) for sale and delivery to Polimeros' customers; or to Comerica, a
        lender with no interest whatsoever in Polimeros' property and, on the contrary, actual knowledge that the PET
        product at issue did not belong to the M&G Polymers.

documents that form a "contract" -- but it simply does not support Comerica's effort to dismiss the Amended Complaint as a matter of law.

To the contrary, and as addressed in detail below, it is clear from the face of the documents that no "contract" exists between M&G Polymers and Polimeros. If anything, the documents relied on by Comerica actually support the existence of a classic consignor/consignee arrangement between M&G Polymers and Polimeros under Delaware law. And as alleged in the Amended Complaint, Comerica -- an asset based lender with a strictly defined "borrowing base" of collateral -- at all times knew M&G Polymers did not own Polimeros' PET. In short, there are no grounds for Comerica's assertion that a "contract" exists between Polimeros and M&G Polymers and, because Comerica's motion to dismiss depends entirely on this assertion, the motion must be denied as a matter of law.

## FACTUAL BACKGROUND

Polimeros is a Brazilian company that produces and manufactures PET.[2] Am. Compl. ¶¶ 2, 14. To date, through mismanagement or other improper conduct, Defendant M&G Polymers, has deprived Polimeros of approximately $90 million. By this action, Polimeros seeks a constructive trust over no less than $10 million -- a small fraction of what it is actually owed -- that can be directly traced to M&G Polymers, and now Comerica. *Id.* at ¶ 46.

Polimeros has long supplied PET directly to its Brazilian customers, but it has also supplied PET to other global customers, using M&G Polymers as a pass-through or middleman. Am. Compl. ¶ 21. There is no contract between Polimeros and M&G Polymers that governs the transfer and sale of PET product (and there never has been any contract). *Id.* at ¶ 26. Rather,

---

[2]   Like those in Polimeros' original complaint, the facts alleged in the Amended Complaint are based on Polimeros' investigation and discussions with the Debtors' CRO. Am. Compl. fn. 2. The Amended Complaint updates and clarifies certain allegations based on additional investigation and visibility afforded to Polimeros and its counsel following the filing of the original complaint in this matter.

Polimeros has relied on its fiduciary relationship with several of M&G Polymers' management, directors and/or fiduciaries, who were also fiduciaries of Polimeros' direct parent company. *Id.*

Based on this trusted and fiduciary relationship, Polimeros sent PET product to M&G Polymers, which then provided the PET to U.S. customers and collected payment from these customers. Am. Compl. ¶¶ 22, 26, 33. The money collected from the U.S customers was intended for Polimeros as the arrangement between Polimeros and M&G Polymers was one of pure administrative convenience -- a fact plainly recognized by the Debtors and their CRO. *Id.*; *see also* Cash Management Motion [Docket No. 7 at ¶¶ 23, 25]. This administrative relationship arose because M&G Polymers is more easily able to handle billing and other back-office functions related to U.S. sales given its U.S. location. In exchange for its services, M&G Polymers collects a small administrative fee from the proceeds generated from the sale of PET product. Am. Compl. ¶ 22.

Through 2016, M&G Polymers moved about $10 million of PET product per month on behalf of Polimeros. Am. Compl. ¶ 27. There can be no doubt that at all times M&G Polymers understood that it was required to send Polimeros the proceeds from sales of its PET product in the United States. Indeed, even the invoices between Polimeros and M&G Polymers for the PET -- attached by Comerica to its motion to dismiss -- make clear that M&G Polymers is nothing more than a "consignee" of Polimeros' product. *Id.* at ¶ 35. In fact, after sales of PET, M&G Polymers recorded journal entries for the receivables that it was required to pay to Polimeros. *Id.* at ¶ 25.

Nonetheless, prior to the appointment of the CRO in 2017, Polimeros did not receive approximately $90 million of dollars in receivables for its PET product because of improper action taken and decisions made by M&G Polymers and its management, directors and/or

fiduciaries. Am. Compl. ¶ 27. Instead, M&G Polymers wrongfully retained and used these receivables, which rightfully belonged to Polimeros, thereby leaving Polimeros with nothing more than an ever-growing intercompany receivable of little or no value. *Id.*

Polimeros was unable to discover the scope of M&G Polymers' withholding of receivables, and the Debtors' control and influence over Polimeros prevented it from pursuing the monies M&G Polymers wrongfully pocketed for its own benefit. Am. Compl. ¶¶ 27, 28. In the fall of 2017, however, independent directors were appointed to Polimeros' board of directors with the intent to reduce the influence and control of the Debtors' incumbent directors and management. *Id.* at ¶ 28. Likewise, at or around this time, the Debtors' CRO was appointed and began to investigate M&G Polymers' improper withholding of receivables. *Id.*

The CRO quickly recognized M&G Polymers' improper and damaging failure to remit proceeds to Polimeros for the sale of its PET product. Accordingly, following the appointment of the CRO, protections were put in place to ensure that Polimeros was properly compensated for the sale of PET product in the U.S. through M&G Polymers as a conduit. Am. Compl. ¶ 29. In fact, the CRO explicitly informed the parties that he would "ensure that a mechanism exists to re-direct the monies back to Brazil (less a local commission of sorts to cover handling costs)." *Id.* at ¶ 31. Thus, although Polimeros and M&G Polymers still did not enter into a contract, the relationship between the two parties was formalized: Polimeros shipped PET to M&G Polymers for Polimeros' U.S. customers and invoiced M&G Polymers for the cost of the PET. *Id.* at ¶ 29. The invoices make clear that M&G Polymers took possession of the PET, not as a buyer, but as "consignee". *Id.* at ¶ 35. Thus, once Polimeros invoiced M&G Polymers, M&G Polymers was obligated to remit the proceeds generated from the sale of the PET to satisfy Polimeros' invoices. *Id.* ¶ 29.

Comerica undoubtedly had actual knowledge of the nature of the consignment arrangement between M&G Polymers and Polimeros. Among other things, it was plainly in possession of the invoices and, indeed, attempts to rely on them in support of its motion dismiss. Am. Compl. ¶ 34. Additionally, as a lender to M&G Polymers under an asset based loan, it routinely monitored and received regular reporting on M&G Polymers' assets, which comprised its borrowing base. *Id.* at ¶ 41. As alleged in the Amended Complaint, therefore, Comerica had actual knowledge -- at all relevant times -- that the receivables at issue here belonged to Polimeros, and not to M&G Polymers. *Id.* at ¶ 42.

Nevertheless, Comerica now seeks to unjustly enrich itself by misappropriating specific property and receivables that rightfully belong to Polimeros. Although Comerica may be entitled to all "accounts receivable or inventory" of M&G Polymers, it is not entitled to the funds at issue here because those funds are proceeds from sales by Polimeros of its PET product using M&G Polymers as conduit. The funds are not -- and never have been -- part of M&G Polymers' estate. Am. Compl. ¶¶ 43, 52.

## **MOTION TO DISMISS STANDARD**

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), courts must accept as true all material allegations of the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015). Thus, a motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Id.*

All that is required to survive a motion to dismiss is that a plaintiff "allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible, and sufficient to overcome Rule 12(b)(6), "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008).

## ARGUMENT

### I. POLIMEROS HAS ADEQUATELY ALLEGED A CLAIM FOR UNJUST ENRICHMENT AGAINST DEFENDANTS

To state a claim for unjust enrichment, a party must allege: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *11 (Del. Super. Ct. Sept. 4, 2013). Here, the allegations in the Amended Complaint plainly meet this standard and are more than sufficient to defeat Comerica's motion to dismiss. Indeed, Polimeros alleges that M&G Polymers, and now Comerica, have been (and will be) enriched through the unjustified retention of PET receivables rightfully belonging to Polimeros. Am. Compl. ¶¶ 1, 10, 13, 43, 45, 47, 51, 52. The Amended Complaint further alleges a fiduciary relationship between M&G Polymers and Polimeros. *Id.* at ¶ 26.

7

As there is no adequate remedy at law to compensate Polimeros for the losses suffered at Defendants' hands, the imposition of a constructive trust over the PET receivables wrongfully retained by Comerica and M&G Polymers is both appropriate and warranted. *See L&L Broad. LLC v. Triad Broad. Co., LLC*, 2014 WL 1724769, at *5 (Del. Super. Ct. Apr. 8, 2014); "Constructive trusts are regularly imposed by courts of equity to remedy unjust enrichment." *Nash v. Schock*, 1998 WL 474161, at *2 (Del. Ch. July 23, 1998); *see also In re Bake-Line Grp., LLC*, 359 B.R. 566, 571-72 (Bankr. D. Del. 2007) (Section 541(d) of the Bankruptcy Code "exclude[s] from the debtor's bankruptcy estate any of the debtor's property held in constructive trust for another party at the time of a bankruptcy filing.")

Comerica's motion to dismiss does not -- and cannot -- directly counter the elements of Polimeros' well-pleaded unjust enrichment claim. Instead, Comerica resorts to a confusing series of peripheral arguments based *entirely* on its incorrect and disingenuous assertion that M&G Polymers and Polimeros "had a contract" (Br. 6) and, therefore, no constructive trust is available to Polimeros. To support this assertion -- and thus the entire basis for its motion to dismiss -- Comerica attaches an unsubstantiated pile of paper to its brief, comprised of purchase orders and invoices (each of which designate M&G Polymers as a "consignee"), and a one-page document titled "Conditions of Sale" which does not appear related to the invoices (and which this time designates M&G Polymers the "Seller" to some unnamed "Buyer" of undefined "Product"). Br. at Exhibit A. For the reasons discussed herein, this purported "contract" is no such thing and certainly does not undercut Polimeros' claims or warrant dismissal of the Amended Complaint as a matter of law at this stage.

## A.    There Was No Contract Between Polimeros and M&G Polymers

Comerica's motion to dismiss depends on its repeated and highly misleading claim that the 84 pages of extrinsic evidence attached to its brief comprise a written "contract" between

Polimeros and M&G Polymers. Comerica is flat out wrong. At best, the purchase order, invoices and "Conditions of Sale" that Comerica has haphazardly combined into one exhibit and submitted with its motion show that M&G Polymers may have entered into contracts with the *third party buyers* of the PET. But there is nothing about the material attached by Comerica to suggest that M&G Polymers entered into any contract with *Polimeros* to purchase PET product. To the contrary, the "Conditions of Sale" (the first page of Comerica's Exhibit A) explicitly states that it governs the terms of a contract between M&G Polymers and a *third party Buyer* of the PET. Indeed, the very first section of the document, titled "Contract Defined" provides:

> "If the sale of products by M&G to Buyer is not otherwise covered by an applicable written agreement between M&G and Buyer, then, upon acceptance by M&G of the quantity of the Product specified on Buyer's purchase order, such quantity together with these Condisions of Sale and allother provisions of any applicable documents of M&G on which the Conditions are printed, will constitute "the Contract" between M&G and Buyer."

Exhibit A, Conditions of Sale §1

There is no reference to Polimeros in the "Conditions of Sale" document whatsoever and, in fact, M&G Polymers (referred to as "M&G" in the document) is defined as the *Seller* of some undefined "Product":



13. ACCEPTANCE, ENTIRETY AND RELEASE. Seller's acceptance of Buyer's order or proposal is expressly conditional on Buyer's assent to the terms of the Contract and M&G rejects any terms of Buyer's order or proposal which differ from or are in addition to them. Buyer's assent to the terms of the Contract will conclusively presumed by Buyer's acceptance of Product delivery. This Contract, as of its beginning date, contains the complete and exclusive agreement of M&G and Buyer concerning the Product, merges and supersedes all prior understandings and representations (oral or written) between the Parties concerning the Product and, except for any indebtedness or indemnify obligation of Buyer to M&G each releases the other from all claims arising in connection with any such prior contract.

14. M&G DEFINED. M&G shall mean M&G Polymers-USA LLC, Seller.

Accordingly, while the "Conditions of Sale" document relied on by Comerica in support of its motion to dismiss may be a contract between M&G Polymers and some unspecified buyers of PET product, there is no basis for Comerica's claim that this is a "contract" governing the

relationship between Polimeros and M&G Polymers (and, accordingly, no grounds for

Comerica's reliance on the document to invoke and rely on Texas law in this matter).[3]

Nor are the delivery invoices also attached by Comerica -- again slapped together under

the same Exhibit A to its brief -- support for its assertion that Polimeros and M&G Polymers

were parties to a "contract." To the contrary, at most these invoices merely confirm that

Polimeros delivered its PET product to M&G Polymers as "consignee" for sale to Polimeros'

customers. *See MLMC, Ltd. v. Airtouch Commc'ns, Inc.*, 215 F. Supp. 2d 464, 477 (D. Del.

2002) (contract requires a clear intent to be bound); *Tel. & Data Sys., Inc. v. Eastex Cellular

L.P.*, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993) (determing that a contract requires a

clear intent to be bound and that determiniation is a factual issue).

Accordingly, none of the extrinsic evidence attached by Comerica as Exhibit A to its

motion evidences any contract for the sale of goods between Polimeros and M&G Polymers.

The *In re Amp'd Mobile, Inc.*, 377 B.R. 478, 481 (Bankr. D. Del. 2007)) case, which Comerica

"primarily relies upon" for support in its motion, is therefore inapposite. In *Amp'd Mobile*, the

parties had expressly entered into a contract, and for that reason there could be no claim for

---

[3]    The Court may rely on extrinsic evidence -- like the material attached to Comerica's brief as Exhibit A -- only if
       it is "undisputedly authentic." *See Ricoh Co. v. Oki Data Corp.*, 2010 WL 3908603, at *2, *4 (D. Del. Sept. 30,
       2010) (refusing to consider a license and translation thereof because one party challenged their authenticity);
       *Nationwide Mut. Fire Ins. Co. v. Sears, Roebuck & Co.*, 2008 WL 613145, at *2-3 (D. Del. Mar. 5, 2008)
       (refusing to consider a sales document when one party challenged its authenticity). Here, Polimeros disputes
       the authenticity of the documentary evidence relied on by Comerica, including the manner in which Comerica
       has assembled this material and presented it as a single document under Exhibit A to its brief. The "Conditions
       of Sale" is clearly intended to govern some relationship between M&G Polymers as seller and a third party
       buyer. *See* Br. Exhibit A at 1 ("If the sale of products *by M&G to Buyer* is not otherwise covered by an
       applicable written agreement between M&G and Buyer, then upon acceptance by M&G of the quantity of
       Product specified on Buyer's purchase order, such quantity together with these Conditions of Sale and all other
       provisions of any applicable document(s) of M&G on which the Conditions are printed, will constitute 'the
       Contract' between M&G and Buyer." (emphasis added)). Buyer is not defined in the "Conditions of Sale" but
       "M&G shall mean M&G Polymers-USA LLC, *Seller*." *Id.* (emphasis added). The document simply *is not*
       between Polimeros and M&G Polymers. Thus, the Court need not -- and should not -- rely on Comerica's
       unreliable extrinsic submission at this stage. Rather, the Court "must accept [the] well-pleaded factual
       allegations in the complaint as true, and view them in the light most favorable to [Polimeros]." *Halpert v.
       Zhang*, 966 F. Supp. 2d 406, 412 (D. Del. 2013).

unjust enrichment. *Id.* ("Amp'd entered into a Handset Protection Service Agreement with Asurion."). Here, by contrast, the absence of any express contract plainly permits Polimeros to assert unjust enrichment claims and seek imposition of a constructive trust over its traceable property. *See Teachers' Ret. Sys. of Louisiana v. Aidinoff,* ("*Teachers*") 900 A.2d 654, 671-672 (Del. Ch. 2006).[4]

**B.      The Parol Evidence Rule Does Not Bar Polimeros' Claim**

Seeking to evade Polimeros' clear allegations -- confirmed by the Debtors' CRO -- that M&G Polymers handled sales of Polimeros PET product for administrative convenience only (Am. Compl. ¶¶ 5, 22, 47, 49, 51), Comerica invokes the statute of frauds and parol evidence rule and claims that these doctrines bar the Court from considering the history of dealings between Polimeros and M&G Polymers. Br. 8-9. This argument again depends entirely on Comerica's assertion that the extrinsic material attached to its brief is a "contract" between M&G Polymers and Polimeros. As shown above and alleged in the Amended Complaint, however, no such contract exists. Am. Compl. ¶ 26. Comerica's reliance on the parol evidence rule and statute of frauds, therefore, is misplaced and irrelevant. *See Brookside Farms v. Mama Rizzo's, Inc.*, 873 F. Supp. 1029, 1033 (S.D. Tex. 1995) (statute of frauds prevents oral agreements from materially modifying ***written agreements***);[5] *Perez v. Alcoa Fujikura, Ltd.*, 969 F. Supp. 991,

---

[4]     The UCC authority cited by M&G Polymers is likewise beside the point here. Section 2.206 stands for the simple proposition that a purchase order can be accepted by either shipment or a promise to ship goods, and UCC 2.204 states that contracts for the sale of goods can be created through agreement of the parties. *See* UCC §§ 2.204, 206. Neither is at issue here, where there is no formal offer, acceptance or contract between Polimeros and M&G Polymers, and where the "agreement" among the parties was that M&G Polymers would act as the middleman for the delivery and sale of goods to the ultimate customer, not that Polimeros would sell anything to M&G Polymers. At best, Comerica is again relying on authority that may govern M&G Polymers' dealings with the third party buyers, but has nothing to do with the actual arrangement between M&G Polymers and Polimeros here.

[5]     The *Brookside* court also recognized that Texas has adopted an exception to the statute of frauds whereby an oral modification to a written agreement "can be binding on the parties to a sale of goods over $500 insofar as specific goods have been received and accepted." *Id.* Therefore, even if there was a written contract between M&G Polymers and Polimeros providing for Texas law in this matter (and there is not), evidence concerning

1006 (W.D. Tex. 1997) (parol evidence rule prevents extrinsic evidence from modifying the terms of complete and unambiguous **written agreements**).  As such, Comerica's reliance on *Brookside* and *Perez* is unavailing.

But even assuming *arguendo* that there was a contract between Polimeros and M&G Polymers (and there is not) the parol evidence rule and statute of frauds would still be inapplicable here.  It is blackletter law that "the Statute of Frauds is not a bar to the creation of a constructive trust arising from an abuse of a confidential or fiduciary relationship in the context of a parol transaction."  *Procom Energy, L.L.A. v. Roach*, 16 S.W.3d 377, 381 (Tex. App. 2000) ("A constructive trust arising out of such abuse of a prior confidential relationship which results in unfair conduct or unjust enrichment escapes the Statute of Frauds."); *see also Hydrocarbon Horizons, Inc. v. Pecos Dev. Corp.*, 797 S.W.2d 265, 267 (Tex. App. 1990) ("The statute of frauds is not a bar to the establishment of a constructive since such trusts may properly be proved by parol evidence").  Thus, Comerica's effort to avoid the clearly alleged facts in this matter by relying on inapposite doctrines must be rejected out of hand.

## II.  POLIMEROS IS ENTITLED TO A CONSTRUCTIVE TRUST

"A constructive trust is frequently employed as an equitable remedy for unjust enrichment."  *Dryden v. Estate of Gallucio*, 2007 WL 185467, at *2 (Del. Ch. Jan. 11, 2007).  That is especially true where, as here, the claim alleges common fiduciaries of multiple companies breaching their fiduciary duties to siphon funds from one company to another, at the expense of shareholders.  *Teachers*, 900 A.2d 654, 658.  Comerica's arguments against this remedy all miss the mark, because they (i) rely entirely on inapposite Texas law, when Delaware law governs this dispute, (ii) ignore that Polimeros has alleged sufficient misconduct to warrant a

---

the oral modification instituted by the CRO would not be prohibited by the statute of frauds because the PET has been accepted and received by M&G Polymers.  Am. Compl. ¶ 27.

constructive trust even under Texas law, and (iii) misstate the tracing requirements needed to survive a motion to dismiss.

### A. Delaware Law Governs Polimeros' Claim for a Constructive Trust

The absence of any contract between the parties, discussed *supra*, vitiates Comerica's reliance on Texas law, invoked by Comerica solely based on the "Conditions of Sale" included in Exhibit A to Comerica's motion. *See* Conditions of Sale, § 11. As discussed above, the Conditions of Sale are irrelevant and, accordingly, so is the governing law in that document. In fact, this Adversary Proceeding involves PET manufactured in Brazil, delivered to ports in Philadelphia, and shipped to customers across the country. Am. Compl. ¶¶ 2, 9. The State of Texas, and its laws, has no connection to Polimeros or its claims.

Rather, Delaware law should govern Polimeros' request for equitable relief in this matter. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007) ("As a federal court exercising jurisdiction over state-law claims, we apply the choice-of-law rules of Delaware, the forum state."). Delaware recognizes the same distinction that most state courts do between "substantive" and procedural/remedial issues -- and "as a general rule, the law of the forum governs procedural matters." *Chaplake Holdings, LTD. v. Chrysler Corp.*, 766 A.2d 1, 5 (Del. 2001); *Naughty Monkey LLC v. Marinemax Ne. LLC*, 2010 WL 5545409, at *8 n.59 (Del. Ch. Dec. 23, 2010) ("Delaware law should determine whether specific performance is an available remedy in this case because it is well established that the law of the forum governs questions of remedial or procedural law.") Thus, this Court should apply Delaware law to Polimeros' request for a constructive trust as Texas has no connection to Polimeros or its claims.[6]

---

[6]     Comerica's purported authority is inapplicable and off the mark. *In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135, 148 (Bankr. D. Del. 2010) actually supports the application of Delaware law because there, as here, there was no written agreement between the parties so the court applied Delaware law. Comerica's reliance on *Bake-Line*, 359 B.R. at 570 is irrelevant because there, the defendant asserted that Illinois law

## B. Delaware Courts Regularly Impose Constructive Trusts

Delaware courts regularly impose constructive trusts in unjust enrichment cases like the instant matter.  *See Nash*, 1998 WL 474161, at *2; *Wells Fargo Bank, N.A. v. Richardson*, 2013 WL 4257967, at *8 (Del. Ch. Aug. 13, 2013); *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *18 (Del. Ch. Jan. 31, 2013); *B.A.S.S. Grp., LLC v. Coastal Supply Co.*, 2009 WL 1743730, at *8 (Del. Ch. June 19, 2009); *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999).  This is especially true where, as here, common fiduciaries are alleged to have breached their fiduciary duties to one company in order to siphon off assets to another company under their control.  *See Teachers*, 900 A.2d 654, 658.

This case is much like *Teachers*, where the raiding of one company to the benefit of another by common fiduciaries supported the imposition of a constructive trust.  In that case, two entities, American International Group ("AIG") and C.V. Starr & Co., Inc. ("Starr"), were controlled and owned by the same AIG executives.  *Id.* at 658.  The plaintiff, a shareholder of AIG, alleged that Starr operated so that the AIG executives could compensate themselves at the expense of AIG.  The plaintiff further alleged that Starr was organized as a separate entity solely to allow the AIG executives "to reap excess profits in their capacity as Starr stockholders, by siphoning commissions and premiums available to AIG itself into an entity whose profits flowed exclusively to AIG managers."  *Id.*  In order to recoup AIG's lost profits, plaintiff sought, among other things, the imposition of a constructive trust.  *Id.* at 660.

Rejecting the defendants' motion to dismiss, the *Teachers* court explicitly recognized that constructive trusts are broad equitable remedies often used to address unjust enrichment,

---

applied and the plaintiff did not challenge that assertion.  Similarly, Comerica's reliance on *In re Interlake Material Handling, Inc.*, 441 B.R. 437, 441 (Bankr. D. Del. 2011) is unavailing because the parties in *Interlake* actually had a written agreement with a choice of law provision.  Here, as discussed herein, there is no written agreement between M&G Polymers and Polimeros.

breaches of fiduciary duties and the wrongful acquisition and retention of property. *Id.* at 670

n.22. Additionally, the *Teachers* court determined that the facts alleged supported imposition of

a constructive trust because the individuals that controlled Starr recognized that Starr was getting

an "unfairly advantageous deal" from AIG. *Id.* at 671. Further, "to the extent that Starr's

controllers intentionally enriched Starr excessively to the detriment of AIG, the relationship

between Starr and AIG is such that a claim for unjust enrichment might later be sustained[,]"

which "could theoretically support the imposition of a constructive trust." *Id.* at 671-72.

The *Teachers* court also refused to dismiss the constructive trust claim even though the

defendants argued that it would "be impossible to trace the cash that Starr received from AIG

with the necessary precision." *Id.* at 673. The court rejected this argument and held that "[a]t

this early stage, it would be inappropriate to deny Teachers the opportunity to make the

appropriate showing that specific funds remain in Starr's hands that are attributable to excessive

payments from AIG." *Id.* Moreover, "[e]ven more important, the [Delaware] Supreme Court's

teachings in *Hogg v. Walker* indicate that a constructive trust can be entered against a defendant

even if the defendant no longer possesses the property improperly taken from the plaintiff, on the

grounds that the trust originally arose at the time the defendant improperly received the

plaintiff's funds." *Id.*[7] Indeed, the court in *Teachers* determined that "equity has a kitbag full of

remedies and that the mere dissipation of the proceeds received from the plaintiff by the

defendant does not render the defendant safe from an equitable remedy requiring economic

restitution to the plaintiff." *Id.*

*Teachers* is squarely on point and supports the imposition of a constructive trust in this

matter. Here, as in *Teachers*, common fiduciaries between M&G Polymers and Polimeros used

---

[7] *Hogg v. Walker*, held that a constructive trust "is an equitable remedy of great flexibility and generality" and that "constructive trust is the formula through which the conscience of equity finds expression . . . to redress a wrong." 622 A.2d 648, 652 (Del. 1993).

their control and authority to siphon money and product away from Polimeros to M&G Polymers apparently in order to subsidize the ever-growing funding gap at Corpus Christie. Am. Compl. ¶¶ 44-46. Such corporate plundering by common fiduciaries (with attendant fiduciary obligations) supports the imposition of a constructive trust because, as an equitable remedy, it is specifically designed to redress such a wrong. *See Teachers*, 900 A.2d at 671-72; *Hogg*, 622 A.2d at 652. Finally, *Teachers* also neutralizes Comerica's tracing argument. Br. 11-13. As discussed in *Teachers* and below, dismissing a constructive trust claim pre-discovery based on purportedly inadequate tracing is premature. *See Teachers*, 900 A.2d at 673. And even if the funds cannot be adequately traced (though, as discussed below, they can in this case), equity still provides a number of remedies to recompense Polimeros for M&G Polymers' wrongful conduct. *See Teachers*, 900 A.2d at 673.

## C. Even if the Court Applies Texas Law, Polimeros Has Still Adequately Alleged a Constructive Trust

While Delaware law should govern in this matter, even the inapplicable Texas authority relied on by Comerica would support Polimeros' claim for a constructive trust in this matter. Under Texas law, constructive trusts are "broad and flexible" remedies used where one party "holds funds which in equity and good conscience should be possessed by another." *Meadows v. Bierschwale*, 516 S.W.2d 125, 132 (Tex. 1974). Generally, Texas courts will impose a constructive trust wherever one party obtains another party's property through either (i) breach of a special trust or fiduciary relationship or (ii) actual or constructive fraud. *Martinez v. Martinez*, 2017 WL 3686850, at *3 (Tex. App. Aug. 23, 2017). Here, the Amended Complaint alleges both.

Indeed, as detailed in the Amended Complaint, Polimeros provided PET to M&G Polymers as a conduit to sell PET to U.S. customers. Am. Compl. ¶¶ 9, 22. This relationship

arose because of M&G Polymers' back office capabilities and location. *Id.* at ¶ 22. Polimeros was induced to enter into this relationship because M&G Polymers was required to remit to Polimeros the proceeds generated from the sale of PET, and because of the fiduciary relationship between Polimeros and M&G Polymers' management, directors and/or fiduciaries. *Id.* at ¶¶ 23, 25, 26. The individuals that managed and controlled both Polimeros and M&G Polymers, however, plainly had no intention of actually remitting the monies owed to Polimeros. Rather, they induced Polimeros to enter into this relationship in furtherance of their scheme to divert money and product away from Polimeros and into their own pockets. *Id.* at ¶¶ 44, 45. If not for the fiduciary relationship and promises of payment, Polimeros would not have continued to transfer PET to M&G Polymers. *Id.* at ¶¶ 26, 31. This scheme bears all of the hallmarks of fraudulent inducement and supports the imposition of a constructive trust. *See Procom Energy*, 16 S.W.3d at 383-84 (holding that fraud is a basis for the imposition of a constructive trust); *Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex. 1984) (imposing constructive trust over property received by defendant as a result of another individual's fraud); *In re Marriage of Braddock*, 64 S.W.3d 581, 587 (Tex. App. 2001) (actual or constructive fraud warrants the imposition of a constructive trust).

Moreover, and contrary to Comerica's baseless assertions, the Amended Complaint sets forth allegations sufficient to establish a confidential relationship between Polimeros and M&G Polymers under Texas law. A confidential relationship arises "where one person trusts in and relies upon another, whether the relation is moral, social, domestic or merely personal." *Lee v. Hasson*, 286 S.W.3d 1, 14 (Tex. App. 2007).[8] And once there is a confidential relationship, "a

---

[8]    Comerica relies on *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 2d 176 (S.D. Tex. 2007) for the proposition that that a fiduciary duty requires that "the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." Br. 10. *Williams*, however, is entirely distinguishable from the case at hand for at least two distinct reasons. First, the suit in *Williams* arose from a

party fails to comply with his fiduciary duty where influence has been acquired and abused, and confidence has been reposed and betrayed." *Id.* Importantly, "[t]he existence of a fiduciary relationship is to be determined from the actualities of the relationship between the persons involved," and "[w]here the evidence is disputed, the existence of an informal, confidential relationship is a question of fact." *Id.*; *see also Procom Energy*, 16 S.W.3d at 382 ("It has been repeatedly held that a jury properly must decide whether a relationship between parties is a confidential relationship.").

Here, considering the "actualities of the relationship" between Polimeros and M&G Polymers alleged in the Amended Complaint, there is no doubt that the parties shared a confidential relationship. As an initial matter, Polimeros and M&G Polymers have a longstanding arrangement whereby, for administrative convenience, Polimeros provided PET to M&G Polymers as a conduit so that PET could be sold to customers in the United States. Am. Compl. ¶¶ 22, 23. This relationship was initially instituted because of M&G Polymers' location and back office capabilities. *Id.* at ¶ 23. Pursuant to this relationship, M&G Polymers acted as middleman for sales of Polimeros' PET product and was supposed to remit receivables from such sales back to Polimeros. *Id.* at ¶ 25. It was based on this relationship of trust and promise of payment that Polimeros continued to send PET to M&G Polymers.[9] *Id.* at ¶¶ 26, 31.

---

simple borrower/lender relationship and the gravamen of the holding was that there is not a fiduciary relationship between a borrower and lender. Here, by contrast, Polimeros and M&G Polymers are not in a borrower-lender relationship but rather have a longstanding and business relationship and a relationship of trust based the companies' shared management, directors and/or fiduciaries and the CRO's promises to ensure that Polimeros is compensated for PET shipped to M&G Polymers. Second, and importantly, the *Williams* court was deciding a motion for summary judgment, not -- as here -- a motion to dismiss. Thus, the plaintiff in *Williams* was at least entitled to discovery to attempt to prove the fiduciary relationship between himself and the defendant.

[9]  Comerica cites *In re Heritage Consol., L.L.C.*, 765 F.3d 507 (5th Cir. 2014), to argue that an ordinary business relationship, even when the parties create a joint venture or partnership, is insufficient to create a fiduciary relationship. Br. 10-11. *Heritage* too is inapposite to the case at hand. As with *Williams*, the *Heritage* case was at the summary judgment stage rather than the motion to dismiss stage. Besides this procedural distinction, Heritage is also factually distinguishable because the parties there had an ordinary manufacturer/supplier

In addition to this longstanding business relationship, Polimeros and M&G Polymers were controlled and managed by the same directors and management, who irrefutably owed fiduciary duties to Polimeros.[10] Am. Compl. ¶¶ 26, 28. The improper conduct by these fiduciaries unjustly enriched M&G Polymers (and themselves) to the detriment of Polimeros. *Id.* at ¶¶ 26, 28, 44, 45. This was not a typical arms-length relationship. Rather, it was a fiduciary one of trust and confidence pursuant to which Polimeros trusted and relied on the fact that M&G Polymers and their shared management, directors and/or fiduciaries would pursue the best interests of both companies. *Id.* at ¶¶ 26, 45. This "abuse of confidence [ ] renders unconscionable the retention of property by [Comerica and M&G Polymers] suffices generally to invoke equitable relief that gives rise to a constructive trust." *Procom Energy*, 16 S.W.3d at 381.

### D.  Polimeros Has Adequately Alleged Tracing At This Stage

Comerica's contention that the Amended Complaint should be dismissed because Polimeros cannot identify and trace the proceeds at issue is wrong on the law and the facts. Contrary to Comerica's assertion, the commingling of assets does not automatically result in the dismissal of actions seeking the imposition of constructive trusts. *See In re Edison Bros., Inc.*,

---

relationship. That is not the case here. On the contrary, the shared management, directors and/or fiduciaries between the M&G Polymers and Polimeros created "a relationship beyond mere business interactions" -- which the *Heritage* court explicitly held creates a fiduciary relationship. *Id.* at 517. Thus, the standard manufacturer/supplier relationship in *Heritage* cannot be compared to the confidential relationship of trust between Polimeros and M&G. For these same reasons, Comerica's reliance on *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720 (5th Cir. 1997), is also misplaced. *ARA* stands for the unremarkable and uncontested proposition that a fiduciary relationship does not arise from a simple supplier/distributor relationship. But as evidenced herein, the relationship between Polimeros and M&G Polymers was anything but standard. The shared fiduciaries' control and influence over Polimeros created a confidential relationship of trust between Polimeros and M&G Polymers, and Polimeros relied that trust to its detriment.

[10]  Comerica cites *In re BH S & B Holdings LLC*, 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009) to misleadingly argue that a parent corporation owes no fiduciary duties to its subsidiaries under Delaware law. Br. 11. The law in Delaware is clear, however, that "parent corporations do not owe ***wholly-owned*** subsidiaries fiduciary duties" because "[a] ***wholly-owned*** subsidiary is to be operated for the benefit of its parent." *Id.* at 144 (emphasis added). A fiduciary obligation does arise if the subsidiary has minority stockholders. *Id.* This distinction is especially important here because Polimeros is not a subsidiary of M&G Polymers. Although M&G Polymers and Polimeros do share a parent company, that company is partially owned by Mossi & Ghisolfi S.p.A. and Magnate S.A.R.L. Thus, the shared management, directors and/or fiduciaries of Polimeros and M&G Polymers do in fact owe fiduciary duties to Polimeros and to its minority shareholders.

243 B.R. 231, 240 (Bankr. D. Del. 2000) (noting that the assertion "that the commingling of funds pre-petition mandates a finding in [defendant's] favor" has been expressly rejected).[11] Rather, courts routinely hold that plaintiffs seeking a constructive trust are entitled to discovery to trace the property where it has been commingled. *See In re Suniva, Inc.*, 2018 WL 1384353, at *3 (Bankr. D. Del. Mar. 16, 2018) (denying motion to dismiss and permitting discovery to establish tracing requirements); *In re Magna Entm't Corp.*, 438 B.R. 380, 396 (Bankr. D. Del. 2010) (same); *Teachers*, 900 A.2d at 673 (determining "it would be inappropriate" to dismiss a claim seeking the imposition of a constructive trust at an "early stage" because it would deny the party seeking the trust "an opportunity to make the appropriate showing" as to tracing the funds). Thus, because it is undisputed that the funds are commingled in the Comerica Collateral Account, it is premature to dismiss the action without first allowing Polimeros discovery to trace the funds to which it is entitled here. *Id.*[12]

And in fact, such tracing will plainly be possible in this case. Indeed, while Polimeros has thus far been denied access to the Comerica Collateral Account, it is clear that the assets attributable to sales of Polimeros' PET product are readily identifiable. Among other things, the Debtors' CRO specifically provided information concerning the relevant quantum of proceeds at

---

[11] Comerica's authority is not to the contrary. The courts in *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1063-64 (3d Cir. 1993) and *Amp'd Mobile*, 377 B.R. at 489-90 approved the use of the "lowest intermediate balance" test to aid parties seeking constructive trusts trace the trust property issue. Neither refused to implement a constructive trust due to commingling. Additionally, Comerica's citation to *Matter of Monnig's Dep't Stores, Inc.*, 929 F.2d 197, 201 (5th Cir. 1991), is perplexing because the court there did not even consider the tracing requirements.

[12] Comerica's tracing argument also fails to the extent that Texas law applies here. It is clear under Texas law that if tracing "is impossible due to commingling . . . the right to a constructive trust is not defeated if the beneficiary can trace to the commingled fund." *Southwest Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 811 (Tex. App. 1994). There is no doubt that the funds that Polimeros seeks to hold in constructive trust can be traced to the Comerica Collateral Account. Thus, Polimeros has adequately traced the funds for the purposes of a motion to dismiss. Nevertheless, even if Polimeros is unable to trace the funds, Texas law permits the entry of a cash judgment. *See id.*; *see also Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 211 (Tex. App. 2014) ("[I]f the funds cannot be traced, a cash judgment may still be entered.").

issue here prior to the filing of this adversary proceeding (*see* Am. Compl. fn. 2) *and* clearly was able to identify and trace the proceeds for inclusion in the Comerica Collateral Account. *See* Doc. 8-1 ¶ 2 ("The Debtors have represented that the gross amount of collections attributable to product manufactured by [Polimeros] and subject to [Polimeros'] claim to establish a constructive trust [ ] in this Adversary Proceeding is $11,889,000.00.").[13]   Comerica's tracing argument thus must be rejected.

## III.   POLIMEROS HAS ADEQUATELY ALLEGED SUPERIOR TITLE AS A CONSIGNOR

In addition to its claims for unjust enrichment and constructive trust, Polimeros has also alleged a consignment arrangement which defeats any interest Comerica may claim in Polimeros' property. Comerica is a secured creditor with a lien over M&G Polymers' property. Am. Compl. ¶¶ 7, 48. But Comerica has no security interest (or any interest whatsoever) in Polimeros or its property. *Id.* at ¶ 52. And, it should go without saying that Comerica's security interest could never attach to Polimeros' PET product while it was in M&G Polymers' possession because the property was held by M&G Polymers on consignment; M&G Polymers *never actually owned* Polimeros' property. *Id.* at ¶¶ 35, 51, 52; *see also In re Ferandos*, 402 F.3d 147, 156 (3d Cir. 2005) ("It is hornbook law that the debtor can only grant a security interest in whatever rights he has in the collateral."); *In re WL Homes LLC*, 476 B.R. 830, 838 (D. Del. 2012) ("Mere possession of a collateral by a debtor is not sufficient to constitute rights in the collateral.").

---

[13]   As will be shown and explored in discovery, the Debtors' CRO actually traced at least $15,757,000 in property attributable to Polimeros' property in preparing the Stipulation Regarding Application of Cash Under Section 8(b) of the Final Cash Collateral Order [Docket No. 8-1]. The $11,889,000 referenced in the stipulation is purportedly net of costs of converting the property.

Comerica states, in conclusory fashion, that Polimeros "never actually alleges that it sold goods to Polymers on a consignment basis." Br. at 7. That is simply false. Polimeros has alleged that it delivered its PET product to M&G Polymers -- as conduit -- for the purpose of sale to Polimeros' customers. Am. Compl. ¶ 37 ("[T]he PET was at all times Polimeros' property, and was merely being delivered to M&G Polymers for transport and sale in its capacity as middleman."). This alleges a consignment under Delaware law on its face. *See State v. All Approved Auto Sales, L.L.C.*, 2009 WL 10674949, at *2 (Del. Com. Pl. Mar. 27, 2009) ("Consignment is a transaction *regardless of the form*, in which a person delivers goods to a merchant for the purpose of sale." (emphasis added)); *see also* Am. Compl. ¶ 91 ("[A]ny contractual arrangement that arose was between a consignor and a consignee, and created a consignment of Polimeros' property.").

As discussed *supra*, the extrinsic evidence attached by Comerica to its motion to dismiss, actually supports Polimeros' allegations that its property was delivered to M&G Polymers on consignment. Indeed, the invoices attached as Exhibit A to Comerica's brief clearly state that M&G Polymers holds the property as a "consignee." *See, e.g.*, Br. Exhibit A at Doc. 18-1, p. 7. Comerica now argues that, under Texas law, a consignee is simply a "person named in a bill of lading," Br. at 7; but under Delaware law -- which actually applies here -- "a consignee is a merchant to which the consigned goods are delivered." *All Approved*, 2009 WL 10674949, at *2.

And, in any event, on this motion to dismiss, Polimeros' allegations of a consignment arrangement, buttressed by the very material attached by Comerica in purported support of its motion, must be accepted as true. *See Fowler*, 578 F.3d at 210; *see also* Am. Compl. ¶ 35. Thus, Comerica cannot merely seek dismissal through self-serving factual assertions that go to

the heart of the dispute. *Fowler*, 578 F.3d at 210. Rather, if Comerica disputes what its *own* documentary submission states -- that M&G Polymers was a "consignee" of Polimeros' PET product -- it should support this position through discovery and seek to litigate the issue at trial.

Moreover, Polimeros has alleged that Comerica had actual knowledge of its consignment arrangement with M&G Polymers. Am. Compl. ¶¶ 34-43. This allegation is supported by the limited record to date. Comerica's lending facility was an "Asset Based Loan," ("ABL"), and, upon information and belief, M&G Polymers was required to provide Comerica detailed information regarding the ABL "borrowing base" of available collateral. *Id.* ¶¶ 41-42. Such disclosures, coupled with Comerica's possession of documents acknowledging M&G Polymers' role as consignee, defeat any security interest Comerica may claim over Polimeros' consigned PET through reliance on the Uniform Commercial Code ("UCC"). *See* 6 Del. Code Ann § 9-101 *et. seq.*

The UCC distinguishes between consignments that satisfy the definition contained in section 9-102(a)(20) and those that do not and, crucially, the latter are governed by state common law. *See In re TSAWD Holdings, Inc.*, 565 B.R. 292, 298 (Bankr. D. Del. 2017) ("Consignments that do not satisfy the UCC definition are governed by state common and statutory law."). Section 9-102(a)(20) of the UCC, in relative part, defines "consignment" as a "transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale" and the merchant: (i) deals in goods of that kind under a name other than the name of the person making the delivery; (ii) is not an auctioneer; and (iii) *is not generally known by its creditors to be substantially engaged in selling the goods of others.* § 9-102(a)(20) (emphasis added).

Here, Polimeros has alleged that "it was at all relevant times generally known by M&G Polymers' creditors that it was substantially engaged in selling the goods of others." Am. Compl. ¶ 38. And this knowledge of Comerica and other creditors that M&G Polymers held Polimeros' PET product on consignment means that the arrangement between Polimeros and the debtors *does not* qualify as an Article 9 consignment. *Id.*[14]

Accordingly, because the consignment at issue was not an Article 9 consignment, Comerica's assertion that Polimeros never filed a form perfecting its consigned interest does not -- and cannot -- defeat Polimeros' interest in its own property and proceeds. *See TSAWD Holdings*, 565 B.R. at 299 ("An unperfected consignor may, however, prevent the application of section 9-319(a) if it can prove, by a preponderance of the evidence, that the transaction is not governed by Article 9 because the consignment does not fit the UCC definition").

Finally, irrespective of whether the consignment falls within the definition of an Article 9 consignment, it is clear that Comerica's *own* actual knowledge of the consignment arrangement between Polimeros and M&G Polymers defeats Comerica's claimed security interest in Polimeros' property. Where a secured creditor has actual knowledge that the borrower holds goods on consignment, this actual knowledge prevents the creditor from obtaining any interest in the consigned proceeds or property. *See Tri-State Chemicals, Inc. v. First State Bank, Stratford*, 185 S.W.3d 519, 523 (Tex. App. 2005) ("[W]e hold that the exception is met, as to a particular creditor, by proof that the creditor had actual knowledge, prior to its extension of credit, that the debtor was substantially engaged in selling the goods of others."). This rule has been followed by courts in the Third Circuit and elsewhere. *See, e.g.*, *GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.*, 474 F. Supp. 1357, 1363 (W.D. Pa. 1979) (holding that a consignor has priority over

---

[14]    This was due, in part, to the fact that M&G Polymers' domestic plant in Corpus Christi was not completed, and the majority of the PET it sold could only be manufactured by its foreign affiliates in Mexico and Brazil.

a secured creditor with actual knowledge of the consignment relationship because any other result would sanction the intentional conversion of goods), *aff'd without opinion at* 622 F.2d 578 (3d Cir. 1980); *Fariba v. Dealer Servs. Corp.*,178 Cal. App. 4th 156, 169 (2009) ("It would be absurd to hold a creditor responsible for imputed knowledge but not hold the same creditor responsible for actual knowledge."); *Belmont Int'l, Inc. v. Am. Int'l Shoe Co.*, 313 Or. 112 (1992) ("In a dispute between a consignor and a creditor of the consignee as to priority in the consigned goods, proof that the creditor actually knew of the consignment before becoming a creditor is sufficient"); *Eurpac Serv. Inc. v. Republic Acceptance Corp.*, 37 P.3d 447, 450-51 (Colo. App. 2000) ("Failure to acknowledge an "actual knowledge" exception would lead to an absurd result. . . . It would be absurd to hold a creditor responsible for imputed knowledge but not hold the same creditor responsible for actual knowledge.").

Accordingly, as demonstrated in *GBS Meat*, Comerica's actual knowledge of the consignment relationship between Polimeros and M&G Polymers defeats any claim to a security interest in Polimeros' property. In *GBS Meat*, two meat vendors entered into consignment agreements with a meat purveyor, Kress-Dobkin Co., Inc. ("Kress-Dobkin"). *GBS Meat*, 474 F. Supp. at 1358-59. Kress-Dobkin was financed by a company called A. J. Armstrong Co., Inc. ("Armstrong"), which had a security interest in all of Kress-Dobkin's "existing and hereafter acquired accounts, notes and other forms of obligations and all existing and hereinafter acquired inventory and all proceeds of all of the foregoing." *Id.* at 1359.

After Kress-Dobkin sold meat that was subject to the consignment agreements, it assigned the receivables and proceeds from the sales to Armstrong. *Id.* The meat purveyors instituted the action and claimed that Armstrong -- in the same position as Comerica here -- had no interest in the receivables and proceeds from the sales because it had actual knowledge of the

consignment agreements. The meat purveyors offered only circumstantial evidence of Armstrong's knowledge of the consignment agreements including: (1) "Armstrong was very interested in monitoring Kress-Dobkin's financial status"; (2) Armstrong contacted Kress-Dobkin almost daily because Kress-Dobkin was in financial distress; (3) "[s]chedules of assignments of accounts receivables passed between Kress-Dobkin and Armstrong each day"; and (4) "Armstrong performed periodic full scale audits of Kress-Dobkin's books and records," which "included examinations of Kress-Dobkin's accounts payable." *Id.*

Based on these facts, the court held that the jury reasonably determined that Armstrong had knowledge of the consignment agreements. *Id.* at 1363. Armstrong's actual knowledge of the consignment agreements was pivotal because "a consignor should prevail over a secured creditor who has actual knowledge of the consignment." *Id.* Indeed, "several of the leading cases" recognize this fact. *Id.* Therefore, the *GBS Meats* court determined that "where a secured creditor knows that the proceeds rightfully belong to a consignor, the consignor must have priority." *Id.*

As in *GBS Meats*, the Amended Complaint alleges that Comerica had actual knowledge of the consignment agreements between M&G Polymers and Polimeros. Among other things, Comerica was in possession of invoices that clearly indicated that M&G Polymers took possession of the PET as a consignee. Am. Compl. ¶ 35. Putting aside this conclusive evidence of Comerica's actual knowledge, Polimeros also alleges circumstantial evidence of Comerica's knowledge. Just as in *GBS Meats*, Comerica, as lender under an Asset Based Loan, actively monitored M&G Polymers' assets, which comprised Comerica's borrowing base. *Id.* at ¶¶ 41-42. Comerica's monitoring of M&G Polymers' assets surely included audits and examinations of M&G Polymers' accounts receivables and payables, which, pursuant to *GBS Meats*, is enough

to establish Comerica's knowledge of the consignment agreements. Therefore, Comerica's purported security interest in Polimeros' property is defeated by its actual knowledge of the consignment agreements between Polimeros and M&G Polymers.

## CONCLUSION

For the foregoing reasons, Comerica's Motion to Dismiss must be denied.

Dated: April 12, 2018                  */s/ Michael W. Yurkewicz*
Wilmington, Delaware

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti, Esq. (DE Bar No. 3989)
Michael W. Yurkewicz, Esq. (DE Bar No. 4165)
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

-and-

Morton R. Branzburg, Esq. (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603

-and-

**KIRKLAND & ELLIS LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Joshua Greenblatt (admitted *pro hac vice*)
Jeremy David Evans (admitted *pro hac vice*)
Jeffrey R. Goldfine (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Yates M. French (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel to M&G Polimeros Brasil S.A.*