# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| M & G USA CORPORATION, *et al.*, | Case No. 17-12307 (BLS) |
| Debtors. | Jointly Administered |
| M&G Polimeros Brasil S.A., | |
| Plaintiff, | Adv. Proc. No. 18-50007-BLS |
| v. | **Related to Docket Nos. 16, 17, 18, and 21** |
| M&G Polymers USA, LLC and Comerica Bank, | |
| Defendants. | |

### Comerica Bank's Reply Brief in Support of Motion to Dismiss Amended Complaint

CONNOLLY GALLAGHER LLP
Karen C. Bifferato (DE Bar No. 3279)
Jeffrey C. Wisler (DE Bar No. 2795)
Kelly M. Conlan (DE Bar No. 4786)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 757-7300
Facsimile: (302) 757-7299
Email: kbifferato@connollygallagher.com
Email: jwisler@connollygallagher.com
Email: kconlan@connollygallagher.com

MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
Jonathan S. Green
Steven A. Roach
Erika L. Giroux
150 West Jefferson, Suite 2500
Detroit, MI 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
Email: green@millercanfield.com
Email: roach@millercanfield.com
Email: giroux@millercanfield.com

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES……………………………………………………… iii

ARGUMENT……………………………………………………………………….1

    A.  Polymers and Brasil Had a Contract for the Sale of Goods………………. 1

        1.  The Brasil-Polymers Sales Arrangement is Not a Consignment………. 4

        2.  The Uniform Commercial Code Governs the Transaction: The Proper Remedy at Law is a Claim for Breach……………………………….6

    B.  Unjust Enrichment Is Not a Proper Remedy Where There Is an Express Contract………………………………………….. …………………….. 8

    C.  A Constructive Trust Is Not an Appropriate Remedy…………………….. 9

CONCLUSION……………………………………………………………………..13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abry Partners V, LP v. F&W Acquis. LLC*, 891 A.2d 1032 (Del. Ch. 2006) ................................ 10

*Adams v. Jankouskas*, 452 A.2d 148 (Del. 1982) ........................................................................... 9

*Asurion Insurance Services, Inc. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478 (Bankr. D. Del. 2007) ........................................................................ 11

*Cantor Fitzgerald, LP v. Cantor*, 724 A.2d 571 (Del. Ch. 2005) ..................................................... 8

*Claybrook v. Consolidated Foods, Inc. (In re Bake-Line Group, LLC)*, 359 B.R. 566 (Bankr. D. Del. 2007) .............................................................................................. 10

*E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912 (7th Cir. 2007) ........................................... 3

*Exp. Dev. Canada v. E.S.E. Elecs.*, 93 UCC Rep. Serv. 2d 785 (C.D. Cal. Sept. 5, 2017) .............................................................................................................................. 5

*GBS Meat Industry Pty. Ltd. v. Kress-Dobkin Co.*, 474 F. Supp. 1357 (W.D. Pa. 1979), *aff'd sub nom.*, 622 F.2d 578 (3d Cir. 1980) ................................................................. 5

*Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470 (3d Cir. 1995) .............................................................................................................................. 5

*Greenly v. Greenly*, 49 A.2d 126 (Del. Ch. 1946) ........................................................................... 9

*Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872 (Del. Ch. 2009) ...................................................... 8

*Minn.-Moline Co. v. Capitol Plumbing, Inc.*, 164 A.2d 868 (Del. Super. Ct. 1960) ....................... 5

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010) ............................................................................... 8

*Otto v. Gore*, 45 A.3d 120 (Del. 2012) ............................................................................................ 8

*Prairie Capital III, LP v. Double E Holding Corp.*, 132 A.3d 35 (Del. Ch. 2005) ....................... 10

*Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51 (2d Cir. 2017), *as amended* (Aug. 21, 2017) ....................................................................................................................... 3

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) .............................................................................. 2

# TABLE OF AUTHORITIES (CONT.)

Page(s)

**Cases (cont.)**

*Six Flags, Inc. v. Parc Mgmt., LLC (In re Premier Int'l Holdings, Inc.)*, 443 B.R. 320 (Bankr. D. Del. 2010) ..................................................................................................7

*State v. All Approved Auto Sales, L.L.C.*, 2009 WL 10674949 (Del Com. Pl. 2009)......................4

*Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 ............................................7

*Wood v. Coastal States Gas Corp.*, 401 A.2d 932 (Del. 1979) .......................................................8

*XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.)*, 16 F. 3rd 1443 (6th Cir. 1994) ...........................................................................................................................................11

**Statutes**

Del. Code Ann. tit. 6 § 2-105(1) ......................................................................................................6

Del. Code Ann. tit. 6 § 2-204 ..........................................................................................................3

Del. Code Ann. tit. 6 § 2-326(3) ......................................................................................................6

Del. Code Ann. tit. 6 § 2-401(1) ......................................................................................................6

Del. Code Ann. tit. 6 § 7-102(a)(3) .................................................................................................4

Article 7 of the U.C.C. ....................................................................................................................4

Article 9 of the U.C.C. ....................................................................................................................4

Uniform Commercial Code § 2-326, cmt. 3 ...................................................................................6

**Rules**

Fed. R. Civ. P. 9(b) .........................................................................................................................9

Plaintiff M&G Polimeros Brasil, S.A. ("Brasil") filed an Amended Complaint [Ad. Proc. D.I. 16] ("Amended Complaint") against Comerica Bank ("Comerica") and against M&G Polymers USA, LLC ("Polymers"), on March 1, 2018, seeking the imposition of a constructive trust upon certain polyethylene terephthalate ("PET") product sold to Polymers by Brasil, and upon the cash proceeds derived from Polymers's sale of this PET product to Polymers's own customers. On March 15, 2018, Comerica Bank filed a Motion to Dismiss Amended Complaint [Ad. Proc. D.I. 17 and 18], and Brasil filed its Response [Ad. Proc. D.I. 21] on April 12, 2018.

Despite Brasil's numerous and blustering attempts to assert otherwise, the nature of this dispute is simple: The parties had a contract for the sale of goods. Brasil did not file a UCC-1 financing statement and otherwise took no action to protect its rights under applicable law. Rather, Brasil allowed its receivables owed from Polymers to grow to over $88 million.[1] Consequently, Brasil filed an unsecured claim, seeking to be paid pro rata with Polymers's other unsecured creditors. Yet, Brasil, an unsecured creditor, now comes before this Court with its constantly evolving allegations of what it apparently perceives to be inequitable conduct (all of which are wrong and legally irrelevant) and asks this Court to step in and excuse Brasil's failure to protect its rights in any way recognized by law. Its claim should fail. Dismissal of the Amended Complaint is warranted as a matter of law.

**ARGUMENT**

A. <u>**Polymers and Brasil Had a Contract for the Sale of Goods.**</u>

Prior to Polymers's bankruptcy, Brasil manufactured, sold, and shipped PET product to Polymers, which Polymers in turn sold to its own customers in the United States. Polymers issued

---

[1] Brasil filed an unsecured proof of claim number 831 in an amount in excess of $88 million on April 5, 2018.

purchase orders for the PET to Brasil, and Brasil correspondingly issued invoices documenting its sales and bills of lading evidencing its shipments to Polymers. *See* Mot. to Dismiss, Ex. A. Although Brasil now denigrates its own invoices and bills of lading as "an unsubstantiated pile of paper," Brasil admits in its Amended Complaint that Brasil generated the invoices. *See* Am. Compl. ¶ 34. Indeed, Brasil signed the invoices and bills of lading. In evaluating a motion to dismiss, the Court may and should consider "document[s] *integral to or explicitly relied* upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks omitted) (emphasis in original). Here, Brasil explicitly relies upon the invoices in its Amended Complaint. *See* Am. Compl. ¶¶ 34–43. Now realizing that the paper trail rings the death knell for its argument, Brasil wants to pretend that these documents have no force. Notably, Brasil does not contest that (a) it generated and signed the invoices, (b) it generated and signed the bills of lading, (c) Polymers sent the purchase orders to Brasil, and (d) Brasil shipped the PET product to Polymers. *See* Opp'n at 10, n.3. Indeed, Brasil's proof of claim includes each and every invoice attached as Exhibit A to Comerica's Motion [Claim No. 831].

If Brasil had wanted to protect itself, it easily could have complied with the U.C.C.'s requirements for evidencing a purchase money security interest or consignment by filing a financing statement and giving notice to Comerica. If Brasil had a consignment "arrangement" with Polymers, Brasil should have protected itself by entering into a written contract that spelled out the terms of that consignment. Brasil retained competent counsel. Yet Brasil did none of these things to protect itself. Importantly, these were "the protections that [should have] been put in place to ensure that [Brasil] was properly compensated for the sale of PET product,"—not the mere promises alleged to have been made by the Debtors' Chief Restructuring Officer (CRO) about their future course of dealing, promises which if made were (and are) of no legal consequence

against third parties. Opp'n at 5.[2] The reason, of course, that these simple steps were not taken is that Brasil elected to continue selling goods to Polymers on credit as an unsecured trade creditor as it had done for many years. Nothing changed.

In its Response, Brasil elects not to discuss at all the legal ramification of the invoices that it admits it generated and sent to Polymers. Amended Comp. ¶¶ 34-43; Claim No. 831. Rather, Brasil elects neither to see the invoices, nor to listen to what the invoices say, nor to address them in any meaningful way. Brasil opts instead to proclaim without any substantive analysis that the invoices mean nothing.

However, the invoices are the contract.[3] A sale of goods occurs whenever the parties reach a sufficiently definite agreement evidencing their intent to enter into a contract. *See* Del. Code Ann. tit. 6 § 2-204.[4] As between merchants, a confirmatory writing—such as an invoice—provided within a reasonable time of the transaction constitutes the contract. *Id.* § 2-201(2). For a transaction in goods, such a writing generally requires only a description of the goods, the price to be paid, the terms of delivery, and the quantity to be provided. *See id.* §§ 2-201, 2-204; *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 58 (2d Cir. 2017), *as amended* (Aug. 21, 2017); *E.C.*

---

[2] Brasil speaks of "ensuring a mechanism" and "formalizing the relationship", without ever disclosing what that "mechanism" is or how that relationship was "formalized" (other than by the purported words and "promises" of the CRO). Opp'n at 5. Brasil also fails to explain why or on what basis third parties, such as Comerica and unsecured creditors generally, should be bound.

[3] Apparently, Brasil opts for dissimilation by not acknowledging that the purchase orders, bills of lading, and invoices are all legitimate documents relating to the goods at question. Notably absent is a statement by Brasil that it did not receive the purchase orders, let alone that it did not sign and send the invoices and bills of lading. *See, e.g.*, Opp'n at 10, n.3.

[4] Brasil asserts Delaware law applies, and not Texas law. Whether Texas or Delaware law applies does not affect dismissal of the Amended Complaint. For purposes of its motion to dismiss, Comerica proceeds on the basis that Delaware law applies.

*Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912, 917 (7th Cir. 2007). Each invoice provides all of this vital information—and, significantly, Brasil signed every one of them.

1. **The Brasil-Polymers Sales Arrangement is Not a Consignment.**

Brasil makes much out of the use of the word "consignee" that appears on the invoices. Brasil, however, does not discuss that each invoice is addressed "TO" Polymers, in the box directly to the left of the box that uses the word "CONSIGNEE". As noted in the opening brief, the term "consignee" as used in the invoices and bills of lading does not evidence a consignment, but rather solely refers to the entity to which Brasil shipped the goods that it sold to Polymers. In Delaware, as in presumably all states that have adopted Article 7 of the U.C.C. regarding documents of title, a consignee means "a person named in a bill of lading to which or to whose order the bill promises delivery." Del. Code Ann. tit. 6 § 7-102(a)(3). Brasil does not contest the proposition that the term "consignee" is routinely used in the shipping context to denote the person to whom delivery is intended (as it is here).

Brasil asserts that "under Delaware law . . . 'a consignee is a merchant to which the consigned goods are delivered'" but fails to note that this is *only* true under Article 9 of Delaware's U.C.C.—the precise body of law that Brasil contends does not apply to this arrangement. *See* Opp'n at 22–25.[5] Section 9-102(a)(19) defines the term "consignee" as it is used in secured transactions. Section 7-102(a)(3) defines the term "consignee" as it is used in the shipping context, which is precisely how it is used between the parties here: to denote the party to whom delivery is to be made.

---

[5] Brasil's reliance upon *State v. All Approved Auto Sales, L.L.C.*, 2009 WL 10674949 (Del Com. Pl. 2009), is misplaced. The court never addressed whether a consignment existed. Rather the Court held that a "consignee" has the power to transfer good title to a buyer, even if a consignment existed in *All Approved*.

A consignment is an agency relationship by which the consignor delivers goods to a dealer, who may either sell the goods or return them without obligation. The dealer is typically required to charge a certain price for those goods, to be established by the consignor. *Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470, 475 (3d Cir. 1995); *Exp. Dev. Canada v. E.S.E. Elecs.*, 93 UCC Rep. Serv. 2d 785 (C.D. Cal. Sept. 5, 2017). The intent of the parties, as evidenced by the terms they use in their agreement, is significant in determining whether a consignment arrangement exists. *See Minn.-Moline Co. v. Capitol Plumbing, Inc.*, 164 A.2d 868, 871 (Del. Super. Ct. 1960). By contrast to the traditional consignment, the Brasil-Polymers contract here makes no provision for return of the PET product. It says nothing as to the price at which Polymers was to sell the goods. And it is silent as to any commission that Polymers was to keep. Rather, the invoices are clear on their face that payment was required within 60 days of the bill of lading date regardless of when, or even if, the product was sold.

Brasil's comparisons to *GBS Meat Industry Pty. Ltd. v. Kress-Dobkin Co.*, 474 F. Supp. 1357 (W.D. Pa. 1979), *aff'd sub nom.*, 622 F.2d 578 (3d Cir. 1980), where the consignor meat merchandisers asserted *non-bankruptcy* claims for conversion, are unavailing. In *GBS*, the creditor was "very interested in monitoring" the debtor company's financial status due to the "precarious nature" of the industry. The creditor contacted the company "almost daily," and received reports on inventory and accounts payable each day. Indeed, the creditor had previously remitted consignment proceeds directly to the consignor. *Id.* at 1359–60. Comerica never exercised this type of "pervasive control" over Polymers's day-to-day operations. *Id*

More importantly, the "arrangement" between Brasil and Ploymers simply was not a consignment contract. The transaction between Brasil and Polymers does not constitute a "sale or return." Since the notion that a seller could demand the return of its goods at will is "so definitely

at odds with any ordinary contract for sale of goods that if a written agreement is involved the 'or return' term must be contained in a written memorandum,"[6] any attempt to assert an "or return" condition is therefore barred by the parol evidence rule and statute of frauds. Del. Code Ann. tit. 6 § 2-326(3). Not a single purchase order, invoice or bill of lading issued between Polymers and Brasil contains the term "or return" (or, for that matter, any language of similar import). Rather, the invoices include a definite and fixed payment term, which is antithetical to any notion of a "sale or return."

2. **The Uniform Commercial Code Governs the Transaction: The Proper Remedy at Law is a Claim for Breach.**

Polymers and Brasil contracted for a sale of goods. *See* Del. Code Ann. tit. 6 § 2-105(1) (defining "goods" as "all things . . . movable at the time of identification to the contract for sale"); § 2-106(1) (defining "sale" as "the passing of title from the seller to the buyer for a price"). The arrangement was simple and straightforward: (1) Polymers issued purchase orders to Brasil; (2) Brasil issued invoices to Polymers; (3) Brasil shipped the PET product to Polymers accompanied by bills of lading; (4) title passed to Polymers; and (5) Polymers was to pay for the PET product within 60 days. As a matter of law, title passed to Polymers upon delivery, as "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." Del. Code Ann. tit. 6 § 2-401(1). And, in this case, Brasil failed to file a UCC-1 financing statement to perfect whatever security interest it may have retained (or is claiming) in the PET and is, therefore, an unsecured creditor holding nothing more than a general unsecured claim. The arrangement is exactly what it looks like—a sale of

---

[6] Uniform Commercial Code § 2-326, cmt. 3 ("The "or return" aspect of a sales contract must be treated as a separate contract under the Statute of Frauds section and as contradicting the sale insofar as questions of parol or extrinsic evidence are concerned.")

goods on an unsecured basis. This Court is not required to accept as true Brasil's allegations when those allegations are clearly contradicted by the documents incorporated into the complaint by reference, as the invoices clearly are here. *See Six Flags, Inc. v. Parc Mgmt., LLC (In re Premier Int'l Holdings, Inc.)*, 443 B.R. 320, 329 n.47 (Bankr. D. Del. 2010) (quoting *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005)); *see also* Am. Compl. ¶¶ 34–43; Opp'n at 21–26.

Furthermore, *Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 is distinguishable from the facts of this case. In *Aidinoff*, executives of a major insurance company siphoned off profits and commissions into a shell company for their personal benefit. *Aidinoff* was a derivative shareholder suit, and the claim for relief against the shell company depended on the fact that the directors of the insurance company likewise owned and controlled the shell company. *See id.* at 660–63. Here, by contrast, Polymers was a fully functional and operational entity conducting business in the ordinary course, and Brasil does not allege that the directors involved in the PET sales directed such transactions to accrue to their own benefit. Additionally, Brasil makes no real effort to describe or identify the control structure between itself and Polymers or to explain its own inaction in allowing the transactions to continue for years and the inter-company receivable to mount.

Although Brasil states "[t]here is no contract between [Brasil] and [] Polymers that governs the transfer and sale of PET product (and there never has been any contract)", Brasil's entire action is based on the notion that Brasil and Polymers entered into an "arrangement" for "administrative convenience" including payment of "a small administrative fee." Its Amended Complaint and Response are replete with references to this "arrangement", and an "historic course of dealing" between Brasil and Polymers. Thus, Brasil alleges the elements of a contract, and not some

amorphous equitable "arrangement." *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012) ("The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."). Specifically, Brasil alleges a contract between itself and Polymers that Polymers allegedly breached by failing to satisfy its accounts payable to Brasil. The proper and only remedy is a breach of contract claim against Polymers—in other words, an unsecured claim payable pro rata with Polymers' other unsecured creditors. This Court should reject Brasil's efforts to gussy up legal conclusions as facts.

**B.     Unjust Enrichment Is Not a Proper Remedy Where There Is an Express Contract.**

Under Delaware law, unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Cantor Fitzgerald, LP v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 2005). To state a claim for unjust enrichment, the plaintiff must prove "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (3) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). Furthermore, a claim for unjust enrichment will not lie where there is a contract between the parties, and the transaction contemplated by that contract forms the basis of the plaintiff's unjust enrichment claim. *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 891 (Del. Ch. 2009).

Brasil's claim therefore fails on multiple grounds. As a threshold matter (and as previously stated), the invoices constitute an express contract between Polymers and Brasil, the terms of which are clear. Polymers was required to pay Brasil for the PET product within 60 days of shipment. It failed to do so, just as it failed to pay many of its other trade creditors. The Bankruptcy Code sets out very specific protections and procedures to maximize recovery for these creditors in an organized and equitable way. Such protections include the filing of claims against

the estate and equal treatment of those claims through payments under a chapter 11 plan—in other words, an explicit and adequate remedy at law.[7] Brasil has consequently failed to plead a claim for unjust enrichment. Unfortunately for Brasil, it may not seek to upend Congress's considered judgment on how to maximize the best interests of the estate and its creditors in a collective proceeding by leap-frogging all other unsecured creditors merely because it is unhappy with its individual recovery.

C. **A Constructive Trust Is Not an Appropriate Remedy.**

Before a court will impose a constructive trust under Delaware law, the plaintiff must establish that some "fraudulent or unfair and unconscionable conduct" occurred on the part of the defendant, and that the defendant owed a duty to the plaintiff. *Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982); *Greenly v. Greenly*, 49 A.2d 126, 129 (Del. Ch. 1946). A debtor's run-of-the-mill failure to pay its trade creditors in the ordinary course simply does not rise to this level of "unfair or unconscionable" misconduct. If it did, each and every unsecured creditor of the bankruptcy estate would be entitled to the imposition of a constructive trust—an outcome that Congress, through the Bankruptcy Code's priority scheme, has clearly rejected.

Moreover, in order to plead fraud under Delaware law and Fed. R. Civ. P. 9(b), a plaintiff must allege "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages." *Prairie Capital III, LP v. Double E Holding Corp.*, 132 A.3d 35, 60 (Del. Ch. 2005). The plaintiff must also identify the time, place, and contents of that false

---

[7] As noted on page 2, Brasil has filed an unsecured claim for these shipments. Every shipment and invoice at issue in Brasil's Amended Complaint is part of its $88 million unsecured claim.

representation and the benefit the defendant intended to gain by making that representation. *Abry Partners V, LP v. F&W Acquis. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Despite multiple attempts to plead its claim, Brasil has still failed to identify any false representation by either Defendant, much less the time, place, or contents of that statement; the benefit intended to be gained by that representation; and whether the Defendant making that representation knew of or was reckless with regard to its falsity. As a matter of law, then, Brasil's allegations, even if taken as true, are inexcusably deficient, and its claims must be dismissed.

Brasil cites a plethora of Delaware cases in an attempt to support its constructive trust claim. All but one are from the Delaware state courts, not Bankruptcy Courts where the interests of third parties are implicated. Brasil cites only one Delaware Bankruptcy Court decision imposing a constructive trust remedy outside of federal common law: *Claybrook v. Consolidated Foods, Inc. (In re Bake-Line Group, LLC)*, 359 B.R. 566 (Bankr. D. Del. 2007). Brasil provides no substantive discussion of *Bake-Line*. In *Bake-Line*, a check payable to Consolidated Foods was delivered to the debtor in error, and the debtor, prepetition, deposited the check into its own bank account. Consolidated Foods contacted the debtor, who then transferred the funds to Consolidated Foods prepetition. *Id.* at 568–69. The trustee later commenced a preferential transfer and fraudulent conveyance lawsuit against Consolidated Foods. *Id.* The Court upheld the validity of the transfer on multiple grounds, including on the basis that the debtor, as the uncontested incorrect recipient of the check, had held the funds in constructive trust for the correct payee. *Id.* at 574. This case does not apply here. Brasil did not deliver goods to Polymers by mistake.

Brasil recognizes that if a contract exists between itself and Polymers, then *Asurion Insurance Services, Inc. v. Amp'd Mobile, Inc. (In re Amp'd Mobile, Inc.)*, 377 B.R. 478 (Bankr. D. Del. 2007), disposes of this case, and Brasil's claims fail as a matter of law. *See* Opp'n at 10–

11. Like the insurance company and debtor in *Amp'd Mobile*, Brasil and Polymers stand in the position of ordinary commercial participants, and the contract between them wholly lacks "[s]ubstantial indicia supporting an inference of a fiduciary or trust relationship—such as clear and explicit language in the governing documents, affirmative statements in the governing documents that the Debtor would have no interest in the [PET], segregation of [proceeds], [or] a chronology of payments requiring the Debtor to remit only those [proceeds] actually received from its customers." 377 B.R. at 485. Rather, the contract here is for the sale of goods, and expressly provides for payment 60 days after delivery.

Brasil does not cite or discuss *XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.)*, 16 F. 3rd 1443 (6th Cir. 1994), or any of its progeny. In *Omegas*, the court refused to impose a constructive trust for alleged fraud committed by the debtor in the course of its prepetition business dealings and held that "[c]onstructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor."[8] *Id.* at 1452. Rather than acknowledging this basic truth, Brasil relies upon two-party non-bankruptcy disputes, which simply are not relevant in the context of a bankruptcy proceeding.

Brasil's characterization of this proceeding as a two party dispute between Brasil and Comerica is simply wrong. To the contrary, the outcome of this dispute will impact the interests of all of the estate's unsecured creditors. If a constructive trust were imposed, the funds subject to the constructive trust would be diverted away from Inbursa and the unsecured creditors on a dollar

---

[8] The court succinctly paraphrased the plaintiff's argument as "Judge, due to debtor's fraud (or whatever), our property rights as beneficiaries of the constructive trust arose prepetition. Therefore, we stand not in the position of unsecured creditors, nor even equal to the trustee in the position of judgment creditors, but as the rightful owners of the *res* held in trust. Oh, and by the way, would you mind conferring on us these ownership rights and declaring that they arose prepetition?" 16 F.3d at 1449–50.

for dollar basis, thereby reducing the money available for innocent unsecured creditors.[9] It is for this reason that bankruptcy courts are extremely reluctant to reorder the Bankruptcy Code's priority scheme by imposing constructive trusts in multi-party proceedings. This is likely the reason why there are no Delaware bankruptcy cases imposing a constructive trust under Delaware law in favor of a trade creditor, as Brasil seeks to do here.

---

[9] Comerica holds an adequate protection lien against $10.6 million of sale proceeds. Should Brasil prevail, Comerica would be able to use these funds to pay its remaining indebtedness of approximately $5 million (an amount which is less than the approximately $15 million of cash collateral used). Comerica also currently holds almost $12 million pursuant to the Order Approving Stipulation Regarding Application of Cash under Section 8(B) of the Final Cash Collateral Order [Ad. Proc. D.I. 21], which amount has not been applied. As a result, the unsecured creditors and Inbursa will suffer a dollar for dollar injury for every dollar that Brasil obtains by leap-frogging priority under its constructive trust argument.

# CONCLUSION

For the foregoing reasons, Comerica respectfully requests that the Court dismiss Brasil's Amended Complaint.

Dated: April 26, 2018

CONNOLLY GALLAGHER LLP

/s/ Jeffrey C. Wisler
Karen C. Bifferato (DE Bar No. 3279)
Jeffrey C. Wisler (DE Bar No. 2795)
Kelly M. Conlan (DE Bar No. 4786)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 757-7300
Facsimile: (302) 757-7299
Email: kbifferato@connollygallagher.com
Email: jwisler@connollygallagher.com
Email: kconlan@connollygallagher.com

and

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jonathan S. Green
Steven A. Roach
Erika L. Giroux
150 West Jefferson, Suite 2500
Detroit, MI 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
Email: green@millercanfield.com
Email: roach@millercanfield.com
Email: giroux@millercanfield.com

*Counsel to Comerica Bank*

#05386902